[No. 17583-1-I. Division One. August 21, 1989.]

GORDON ANDREWS, ET AL, *Appellants,* v. DONALD R. BURKE, JR., *as Executor,* ET AL, *Defendants,* VALLEY GENERAL HOSPITAL, *Respondent.*

*John Jensen* and *Neil J. Hoff,* for appellants.

*William R. Hickman, Heather Houston,* and *Reed McClure Moceri Thonn & Moriarty,* for respondent.

SCHOLFIELD, J.—Gordon Andrews appeals the entry of a judgment following a jury verdict for the defendant, Valley General Hospital. We affirm.

## FACTS
In April 1981, Andrews, age 54, was admitted to Valley General Hospital (hereinafter Hospital) by his physician, Dr. Donald Burke, for a surgical procedure called gastroplasty plication, also known as stomach stapling. The purpose of the surgery was to treat obesity, since Andrews weighed over 300 pounds. Dr. Burke had previously admitted Andrews to the Hospital in December 1980 for evaluation as to whether his night breathing problems were a result of congestive heart failure. Andrews' stomach stapling surgery took place on April 2, 1981. The surgery was apparently successful; however, Andrews' spleen was damaged in the process and was removed.

Christine Dallenbach, one of the nurses attending Andrews during the postoperative period, obtained a medical history from him in which he told her that he suffered from congestive heart failure in 1980 and continued to suffer from chest pains, shortness of breath, and had trouble sleeping at night. He was taking nitroglycerin for the chest pains. Following the surgery Dallenbach kept his bed at a 45-degree angle, with the bed bent in the middle, to enable Andrews to breathe better and to make it impossible for him to slip down in the bed.

On the evening of April 3, 1981, Dallenbach gave Andrews an injection of Demerol and Vistaril, a narcotic pain reliever and a narcotic enhancer, at 7 p.m. At 8 p.m., she tried to get Andrews to walk while the drug was at peak effectiveness. After a few steps, he complained of severe pain. Andrews requested more pain medication, and at 9 p.m., Dallenbach gave him another Demerol/Vistaril injection. While Dr. Burke's standing, written orders were for pain medication every 3 to 4 hours, he had previously advised Dallenbach that she should medicate his patients more frequently if they were in pain, using her best judgment. According to the trial testimony and Andrews' hospital chart, the 9 p.m. injection was the last pain medication given prior to his respiratory arrest at 3 a.m. the next morning.

According to Dallenbach, Andrews slept uneventfully for the next 2 hours. His breathing was fine, and his airway was open. Andrews' breathing, both before and after the surgery, was loud enough that it could be heard at the nurses' station, several feet away. Evelyn Rydberg replaced Dallenbach on the next shift and was informed of Andrews' condition. Rydberg checked on Andrews at midnight, and he was resting quietly. During the course of the night, she checked on him approximately every half hour, and spoke with him several times. He was having no difficulty breathing.

According to both Rydberg and Leah Cosgrove, the practical nurse on duty, at approximately 3 a.m. on April 4,

Andrews stopped breathing. Because his breathing had been audible, it was easily noticed when he stopped. Rydberg went to his room and attempted to rouse him. When that failed, she shouted to Cosgrove to call an emergency code red. By the time Rydberg had lowered Andrews' bed, the resuscitation team arrived and inserted a tracheal tube into Andrews, and began administering oxygen. Examination subsequent to the respiratory failure indicated that Andrews had sustained permanent brain damage.

There was conflicting expert testimony as to whether or not the 9 p.m. dosage of Demerol/Vistaril was a contributing cause to Andrews' respiratory arrest.

On appeal, Andrews makes 18 assignments of error, 17 of which relate to the trial court's refusal to give a number of requested jury instructions relating to negligence per se, corporate negligence, and res ipsa loquitur.

## NEGLIGENCE PER SE

Former RCW 70.41.030 requires the Department of Social and Health Services to adopt such minimum standards and regulations pertaining to the operation of hospitals "required for the safe and adequate care and treatment of patients." Administrative regulations so adopted pursuant to statutory authorization are set forth in the Washington Administrative Code.

WAC 248–18–031 directs hospitals to establish a governing body responsible for adoption of policies concerning operation of the hospitals. Andrews argues any rules adopted by this governing body have the force of law, and a breach of any such rule or regulation is negligence per se. He cites no authority for this proposition. The statute requires nothing more than that the Department of Social and Health Services adopt minimum standards. Andrews has not directed us to any administrative regulation contained in the Washington Administrative Code that was violated by the Hospital in this case.

■ Standards adopted by private parties or trade associations are admissible on the issue of negligence where shown to be reliable and relevant, but do not have the legal force of a statute, ordinance, or statutorily authorized administrative regulation. *Nordstrom v. White Metal Rolling & Stamping Corp.*, 75 Wn.2d 629, 453 P.2d 619 (1969); *Bayne v. Todd Shipyards Corp.*, 88 Wn.2d 917, 922, 568 P.2d 771 (1977). That being so, it follows that a violation of such a hospital regulation does not amount to negligence per se.

In *Pederson v. Dumouchel*, 72 Wn.2d 73, 80, 431 P.2d 973, 31 A.L.R.3d 1100 (1967), the court held that it was negligence as a matter of law for a hospital to permit a surgical operation upon a patient under general anesthetic without the presence and supervision of a medical doctor in the operating room, unless the operation was performed under emergency circumstances. The court then mentioned that its conclusion was "fortified by the fact that the hospital permitted the breach of one of its own rules." *Pederson*, at 80. The *Pederson* case does not stand for the proposition that the breach of a hospital rule amounts to negligence per se. The court did not refer to the breach of the hospital rule in terms of negligence per se, but used it only to support a conclusion the court had reached on the facts of the case.

Proposed instructions on negligence per se numbered 2 and 6 through 13 inclusive all commence by stating, "A Valley General Hospital Regulation provides . . .", and end with the paragraph:

> The violation, if you find any, of a hospital regulation is negligence as a matter of law. Such negligence has the same effect as any other act of negligence.

The trial court was correct in rejecting these proposed instructions, since hospital regulations do not have the status of administrative regulations such as that involved in *Bayne*.

Proposed instructions 14 through 21 inclusive all commence by stating, "A statute provides . . .", and end with the paragraph:

> The violation, if you find any, of a statute is negligence as a matter of law. Such negligence has the same effect as any other act of negligence.

■ These proposed instructions are incorrect. None of them is supported by a statute, and Andrews cites no statutory authority for them. It follows that a violation would not be negligence per se. Since the proposed instructions are not supported by a statute, the misleading wording of the instructions, standing alone, provided the trial court with sufficient grounds for rejection.

## Res Ipsa Loquitur

Andrews assigns error to the refusal of the trial court to give his proposed instruction on res ipsa loquitur.

A res ipsa loquitur instruction is appropriate when three elements are present:

> (1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury–causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff.

*Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 359, 382 P.2d 518 (1963).

Andrews argues his case is comparable to *Pederson v. Dumouchel, supra,* where, in an operation to reduce a fractured jaw, the patient was administered a general anesthetic and did not awaken for approximately 1 month and suffered permanent brain damage. The court held these facts were so extraordinary as to raise an inference of negligence.

The evidence in the case sub judice is not sufficiently comparable to *Pederson* to make it controlling. Andrews had a history of chest pain and shortness of breath. He

weighed over 300 pounds, smoked one to two packs of cigarettes daily, and drank heavily. The evidence disclosed that the cardiac/pulmonary arrest occurred suddenly and without warning. Andrews appeared to be comfortable and was communicating with the nurse shortly before it occurred.

There was evidence Andrews' obesity contributed to the problem of resuscitation. Dr. Frederick Cheney, an anesthesiologist, testified, "The fact that he has residual brain damage, perhaps, isn't surprising considering the technical difficulty of performing cardiopulmonary resuscitation on somebody with that body."

■ Dr. Cheney also testified that the resuscitation efforts were done well and that people can die of respiratory/cardiac arrest even when resuscitation is commenced immediately. While the testimony of expert witnesses called by the defendant will not always justify a refusal to give a res ipsa loquitur instruction, the overall circumstances and the expert testimony in this case support the trial court's refusal to instruct on res ipsa loquitur. What occurred to Andrews is not so unusual or extraordinary as to infer that it was caused by negligence.

The Supreme Court has stated that

medicine is an inexact science where the desired results cannot be guaranteed, and where professional judgment may reasonably differ as to what constitutes proper treatment.

(Italics omitted.) *Watson v. Hockett,* 107 Wn.2d 158, 167, 727 P.2d 669 (1986) (quoting J. Perdue, *Texas Medical Malpractice,* ch. 2, "Standard of Care", 22 Hous. L. Rev. 47, 60 (1985)).

The fact that an injury rarely occurs is not sufficient standing alone, to invoke res ipsa loquitur. In *Swanson v. Brigham,* 18 Wn. App. 647, 571 P.2d 217 (1977), the plaintiff was admitted to the hospital with infectious mononucleosis. He died from asphyxiation caused by a sudden, acute closing of the air passage. The trial court's refusal to instruct on res ipsa loquitur was affirmed on appeal, the court stating at page 650:

It is a rare occurrence when someone admitted to a hospital for the treatment of infectious mononucleosis dies of asphyxiation. But that is not sufficient to invoke res ipsa loquitur. The fact that the injury rarely occurs does not in itself prove that the injury was probably caused by someone's negligence. *Mason v. Ellsworth*, 3 Wn. App. 298, 474 P.2d 909 (1970). Nor is a bad result by itself enough to warrant the application of the doctrine. *Nelson v. Murphy*, 42 Wn.2d 737, 258 P.2d 472 (1953).

The trial court did not err in refusing to instruct the jury on the doctrine of res ipsa loquitur.

## CORPORATE NEGLIGENCE

*Pedroza v. Bryant*, 101 Wn.2d 226, 677 P.2d 166 (1984) imposes a duty on hospitals running to its patients to exercise reasonable care in the granting, renewal and delineation of staff privileges. This amounts to a duty to exercise reasonable care to limit staff privileges to competent physicians.

Andrews requested a jury instruction on corporate negligence, which the trial court rejected. Nowhere in his argument on appeal does Andrews assert that Dr. Burke was an incompetent physician, whom the Hospital should have identified and removed from staff privileges prior to the admission of Andrews into the Hospital. Nor does Andrews identify any act of malpractice committed by Dr. Burke that the Hospital should have prevented in discharge of its corporate responsibility to him.

Andrews argues that without the instruction, the jury did not know it could find the Hospital liable if it allowed Dr. Burke to violate Hospital regulations. Andrews asserts that Dr. Burke did not comply with Hospital rules with respect to placing in the chart a full history and description of his physical condition on admission to the Hospital. He presents no evidence, however, showing the Hospital had knowledge of these oversights in time to do anything about them or that its failure to correct them contributed to Andrews' cardiac/pulmonary arrest.

There was insufficient evidence before the jury to support a corporate negligence instruction, and therefore, failure to give it was not error.

## OTHER INSTRUCTIONS

Andrews proposed an instruction reading as follows:

> A Valley General Hospital Regulation provides that care given to patients will be carried out in accordance with hospital and department of nursing policy and procedures, and the guidelines for nursing practices.
>
> The violation, if you find any, of a hospital regulation is negligence as a matter of law. Such negligence has the same effect as any other act of negligence.

As previously stated, a violation of this regulation would not be negligence per se. An additional reason the trial court did not err in failing to give this instruction is that there was no evidence before the jury from which it could find that a violation of this regulation was a proximate cause of Andrews' pulmonary arrest.

Andrews also proposed an instruction reading as follows:

> Valley General Hospital's written ByLaws, procedures and regulations are a standard of care and should be considered by you in determining whether the Hospital was reasonable and prudent in caring for Gordon Andrews.

The failure to give this instruction was not error for the same reason involved in many of Andrews' proposed instructions, and that is that the jury was not presented evidence from which it could find that a violation of the instruction was a proximate cause of Andrews' pulmonary arrest.

## COST BILL

Finally, Andrews assigns error to allowance of costs for depositions that were not used at trial, expert witness fees, and costs of obtaining medical records not admitted into evidence.

In responding to this assignment of error, the Hospital concedes that a remand to the trial court is necessary in order that costs awarded the Hospital be limited to those

portions of the deposition used at trial as substantive evidence or for impeachment purposes. *See* RCW 4.84.010(7); *Hinote's Home Furnishings, Inc. v. Olney & Pederson, Inc.*, 40 Wn. App. 879, 700 P.2d 1208 (1985).

Andrews also complains of allowances of expert witness fees. Our review of the cost bill reflects allowance of an expert witness fee to Ernest Coombs, Ph.D. and Sandra Dalton, R.N.

■ RCW 2.40.010 reads as follows:

> Witnesses shall receive for each day's attendance in all courts of record of this state the same compensation per day and per mile as jurors in superior court. . . .

Expert witness fees are not recoverable under RCW 2.40-.010, and the fees allowed to Dr. Coombs and Nurse Dalton are disallowed.

Andrews also objects to witness fees for medical records depositions that were not submitted as evidence at trial.

RCW 4.84.010(5) permits reimbursement of

> [r]easonable expenses, exclusive of attorneys' fees, incurred in obtaining reports and records, which are admitted into evidence at trial . . . including . . . medical records . . .

The Hospital concedes that the records of Good Samaritan Hospital were not admitted at trial and do not fall within the provisions of RCW 4.84.010. The Hospital contends that the other medical records in issue were admitted into evidence and that cost bill items with respect to those are correct.

Andrews' brief is not sufficiently specific that we can make any further rulings with respect to the cost bill. This matter is remanded to the trial court for modification of the cost bill in light of the corrections indicated above and the concessions made by the Hospital. Otherwise, the trial court judgment is affirmed.

COLEMAN, C.J., and SWANSON, J., concur.

Review denied at 113 Wn.2d 1024 (1989).