[No. 15171-5-II.    Division Two.    December 21, 1992.]

NADINE MCCLUSKEY, *Individually, as Guardian, and as Personal Representative, Respondent,* v. TIMOTHY HANDORFF-SHERMAN, *Defendant,* THE STATE OF WASHINGTON, *Appellant.*

---

98

*Kenneth O. Eikenberry, Attorney General,* and *Delbert W. Johnson* and *Michael A. Nicefaro, Jr., Assistants,* for appellant.

*Charles K. Wiggins* and *Edwards, Sieh, Wiggins & Hathaway, P.S.; Keith L. Kessler* and *Stritmatter, Kessler & McCauley; Mark E. Barber* and *Warren, Kellogg, Barber, Dean & Fontes, P.S.,* for respondent.

SEINFELD, J. — Wallace McCluskey was killed in a 2-car collision on State Route 900. His widow, Nadine McCluskey, on her own behalf and as guardian of her minor children, brought a survival action and wrongful death action against the State of Washington and against Timothy Handorff-Sherman, the driver of the other car. A jury found both defendants

negligent and awarded Mrs. McCluskey $1,682,984.37 in damages.[1]

The State then moved for a new trial, alleging irregularities in the proceedings in the form of collusion between plaintiff and defendant Handorff-Sherman and errors of law in the admission of evidence and in jury instructions. The trial court denied the State's motion and the State now appeals. We affirm.

FACTS

In the late afternoon of January 13, 1989, 16-year-old Timothy Handorff-Sherman, an unemployed high school dropout, was driving home to Renton in his 1973 Mustang. He was accompanied by a few friends with whom he had shared several pipes of marijuana during the course of the day. It was raining hard and, as he turned off Interstate 5 onto Martin Luther King Way (State Route 900), it started to snow.

Proceeding east on Martin Luther King Way, Handorff-Sherman stopped at the first traffic light. His was the second car in the inside lane when the light changed, but he wanted to pass the car in front of him and moved into the right-hand lane to do so. He then accelerated in order to complete the passing maneuver and found himself heading downhill toward a "dip" in the road where water had collected. Continuing to accelerate, he moved back toward the left-hand lane. The Mustang's tires lost traction on the wet roadway surface and the car slid across the median into oncoming traffic, striking Wallace McCluskey's car, forcing it down an embankment. McCluskey was thrown from his car and died at the scene.

In her complaint, Nadine McCluskey alleged that Handorff-Sherman negligently operated his vehicle and that the State had "maintained a hazardous and unsafe roadway" and

---

[1] Prior to trial the court granted plaintiff's motion for partial summary judgment, ruling that Wallace McCluskey was free of contributory negligence.

had "failed to adequately and properly separate eastbound and westbound traffic." John Hoglund, generally known as a plaintiff's lawyer in personal injury cases, agreed to represent the indigent, uninsured, and still unemployed Handorff-Sherman on a pro bono basis. Handorff-Sherman obtained Hoglund's name through the Puget Sound Legal Services Foundation, for whom Hoglund had previously defended low income clients, pro bono, in automobile accident cases.[2]

McCluskey made numerous motions in limine. Handorff-Sherman joined in some and made no objection to others. For example, Handorff-Sherman joined in McCluskey's motion to exclude any reference to Handorff-Sherman's marijuana use and he did not object to plaintiff's motion to prohibit any mention of annuities Wallace McCluskey may have had. (Hoglund later contended that his failure to object with respect to the annuity issue was an oversight.) The trial court denied both of those motions.

In his opening statement, Hoglund advised the jury that his client accepted partial responsibility for the accident and that he would not contest the plaintiff's damages. However, he asserted that the State "was a partner in that responsibility" because of its negligent failure to place warning signs or to construct a median barrier to separate eastbound and westbound traffic.

At trial, McCluskey presented results of tests performed by the State that indicated that the friction of the road surface at issue was below the desirable minimum and was in a category that "should be monitored for indications of potential hazards." The evidence also showed that the State failed to take any action in response to these test results. McCluskey's expert testified that this section of road "is unreasonably dangerous", that it is a high-frequency accident area, and that the State should have taken one of the following four steps to prevent accidents: post "slippery

---

[2]"A lawyer should render public interest legal service. A lawyer may discharge this responsibility by providing professional services at no fee or a reduced fee to persons of limited means . . .". Rules of Professional Conduct 6.1.

when wet" warning signs; post speed reduction advisory signs; resurface the roadway to eliminate the slippery condition; or place a median barrier to prevent crossover head-on collisions.

The State denied that this area of the highway was unreasonably dangerous, that it had an unusual accident rate, or that it was unusually slippery. Moreover, the State asserted that the remedial measures suggested by McCluskey were contrary to industry standards and would cause more problems than they would cure.

The State wanted to argue, in the alternative, that it could not be held liable for its failure to make certain improvements to SR 900 since the Legislature controlled the expenditure of funds for road projects through its adoption of a priority array and the Legislature did not authorize funding for the improvement of this section of road.[3] (The State did not, however, claim discretionary immunity and it admitted that it could not assert poverty as a defense to the negligence claim.) To support this theory, the State sought admission of the 193-page *1986 Priority Array, Primary Highway Priorities by State Route*. The trial court excluded the document.

The trial court did allow the State to describe the priority-determining process in general: Department of Transportation personnel gather accident statistical data, examine each site and list projects that they recommend for funding in the next biennium; the Secretary of Transportation and the Transportation Commission further review the list and eventually approve certain projects; the list then becomes the official highway program for the next 2 years. An expert for the State also explained the different kinds of highway

---

[3]Pursuant to the priority process, the State Transportation Commission divides the state into highway districts and divides available funds among the districts. Each district identifies highway programs and projects it wants funded for a particular biennial period. The Commission ranks the programs according to a formula based on various factors including the structural condition of the pavement and fatal and nonfatal accidents. This information is compiled in a document called a Priority Array which is submitted to the Legislature for its use in authorizing and funding particular projects. RCW 47.05.

funds available to the State, and the restrictions on those funds. In addition, the trial court permitted the State to compare accident rates on the section of the road at issue with accident rates on comparable stretches of highway.

The State submitted a series of jury instructions detailing the law related to priority programming for highway development, RCW 47.05, and advising the jury that it could not find the State liable if it determined that the State acted in accordance with that law. The trial court declined to give any of those instructions. The trial court did instruct the jury, over the objection of the State, regarding the "emergency doctrine" as it pertained to Handorff-Sherman's liability.[4]

After the jury returned its verdict finding both the State and Handorff-Sherman each 50 percent liable, the State moved for a new trial and sought a posttrial hearing to determine whether plaintiff and Handorff-Sherman, who outwardly appeared to be adversarial parties, had secretly agreed to work together to obtain a verdict against the State, the defendant with the "deep pocket". The trial court initially agreed to a hearing on the collusion issue, but after receiving affidavits and memoranda explaining the various actions taken by the parties during the course of the trial, and after being advised of the circumstances surrounding Hoglund's representation of Handorff-Sherman, the trial court declared that all its questions had been adequately addressed. Consequently, it canceled the evidentiary hearing and denied the motion for a new trial.

In its appeal, the State contends that the trial court erred by (1) denying its motions for an evidentiary hearing and for a new trial based on trial irregularities and the unusual collaborative conduct between plaintiff and codefendant Handorff-Sherman; (2) excluding evidence regarding State compliance with statutes establishing priorities in funding highway projects; (3) refusing to instruct the jury regarding

---

[4] The instruction stated that a person who is acting in response to an emergency is not necessarily negligent.

priority programming; and (4) instructing the jury to consider the emergency doctrine as it related to the conduct of Handorff-Sherman.

## I

We will reverse a trial court's denial of a motion for a new trial only upon a showing that the trial court abused its discretion. The trial court abused its discretion only if it based its decision on untenable grounds or acted for untenable reasons. *Kramer v. J.I. Case Mfg. Co.*, 62 Wn. App. 544, 561, 815 P.2d 798 (1991); *Dean v. Group Health Coop.*, 62 Wn. App. 829, 834, 816 P.2d 757 (1991). The State has not made such a showing in this case.

Although the State was not able to provide evidence of an agreement between plaintiff and Handorff-Sherman, it lists numerous actions of counsel that it contends indicate improper "collaboration" between the two parties, warranting further investigation. The State argues that if the plaintiff and codefendant did act in concert pursuant to a secret agreement, while simultaneously falsely portraying themselves as adversaries, the colluding parties misled the jury, prejudiced the State, and violated public policy. Although we agree that the two parties were in what could be termed "unusual synchronization" on various issues, the trial court did not err in concluding that these circumstances alone did not require an evidentiary hearing or a new trial.

As indicators of improper collaboration, the State points to Handorff-Sherman's failure to object to plaintiff's motions in limine or to her damages, to Handorff-Sherman's agreement with plaintiff's jury challenges and selection, and to his targeting the State as the responsible party. Additionally, the State contends that the plaintiff and codefendant buttressed each other's cases through cross examination of witnesses. The State also points out that the plaintiff engaged in various measures to reduce the liability of Handorff-Sherman.

The existence of an undisclosed agreement between outwardly adversarial parties at trial can prejudice the proceed-

ings by misleading the trier of fact. Such agreements are referred to as "Mary Carter Agreements". *Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. Dist. Ct. App. 1967). Where appellate courts have permitted such agreements, they also have required pretrial disclosure to the trial court. The trial court can then advise the jury of the agreement so that jurors can consider the relationship in evaluating evidence and the credibility of witnesses. *See Daniel v. Penrod Drilling Co.*, 393 F. Supp. 1056 (E.D. La. 1975); *Ward v. Ochoa*, 284 So. 2d 385 (Fla. 1973); *Maule Indus., Inc. v. Rountree*, 284 So. 2d 389 (Fla. 1973); *Ratterree v. Bartlett*, 238 Kan. 11, 707 P.2d 1063 (1985).

The case before us differs from the above cases in a significant way: the State did not establish (nor did it present an offer of proof as to what it would have proved at an evidentiary hearing) that any kind of agreement, written or otherwise, existed between plaintiff and Handorff-Sherman. The State's indicators of collaboration are not susceptible to only one interpretation. Plaintiff acted in accordance with a reasonable trial strategy in seeking to portray the young, indigent, uninsured Handorff-Sherman in the best possible light and the State in the worst possible light. Although Handorff-Sherman appeared to share responsibility for the accident, plaintiff's ability to recover a judgment from this insolvent young man with a bleak financial future appeared doubtful. Since Wallace McCluskey was free of any negligence, the two defendants were jointly and severally liable for the total of their proportionate shares of responsibility. RCW 4.22.070(1)(b). Thus, if the State were liable to any degree, plaintiff would be entitled to recover the total amount of the judgment from the State. In light of the operation of comparative negligence law, we do not view plaintiff's efforts to persuade the jury that the State was at least partially responsible as inherently suspect.

On the other hand, the record portrays Handorff-Sherman, at the time of the accident, as a rather thoughtless and irresponsible teenager. Recognizing this, it would not be

unreasonable for experienced trial counsel to seek to minimize the jury's negative reaction to his client by having the client show remorse, accept some responsibility, but then identify another defendant equally or more responsible but lacking in remorse — here the State of Washington. Even if Handorff-Sherman's counsel were philosophically sympathetic to claimants' cases and thus selected a trial strategy helpful to plaintiff, it would be inequitable to penalize the plaintiff for defense counsel's trial strategy absent evidence of actual collusion.

The State's list of parallel positions taken by plaintiff and Handorff-Sherman, although extensive, does not, by itself, establish collusive conduct. Furthermore, there was no basis for the trial court to believe that an evidentiary hearing would produce any direct evidence of an agreement. On the other hand, there is a substantial likelihood that such an inquiry, although nonproductive, could invade attorney-client privilege. In light of all these considerations we cannot say that the trial court abused its discretion in denying the State's motion for an evidentiary hearing and for a new trial.

## II

We next turn to the State's contention that the trial court improperly limited evidence of the priority process governing the initiation and funding of state highway projects. Our review of a trial court's evidentiary rulings is again for abuse of discretion. *In re P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159, *review denied*, 115 Wn.2d 1019 (1990). After reviewing the record, paying particular attention to the trial court's rulings on the priority issue, we do not find an abuse of discretion.

The trial court provided several reasons for its ruling excluding state evidence of legislative limitations on funds. First, the State did not contend that if it had more funds, it "would have fixed the problem". Therefore, the court held that fund limitation evidence was irrelevant. Second, the court ruled that even if the State's defense were lack of funds,

the State could not use evidence of the priority process to argue immunity from or limits on liability due to a lack of funds allocated to highway maintenance. Finally, the court expressed its concern that the *1986 Priority Array* document would confuse the jury by diverting its focus to an irrelevant comparison of the relative safety of highways throughout the state, thereby "interject[ing] another layer of issues."

■■ The State presented alternative defenses: either the road was not unreasonably dangerous, or, if it was, it could not make improvements because the Legislature had not approved the funds. The excluded evidence was relevant to the latter theory. However, lack of funds was an improper defense.

The State has the authority to determine whether it will be immune from liability for its tortious acts. Const. art. 2, § 26. In 1961 the Legislature waived sovereign immunity:

> The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation.

RCW 4.92.090 (as amended in 1963). Furthermore, the Legislature, in enacting laws governing the priority order of highway projects, RCW 47.05, did not grant the State immunity from liability for negligent design or maintenance of unfunded projects. The State, then, is in the same position as any other defendant — liable for tortious conduct "to the same extent as if it were a private person or corporation." RCW 4.92.090.

Nonetheless, the State in this case seeks to immunize itself from liability on the basis that it followed state law governing the allocation of resources with respect to highway maintenance. In support of its argument, the State relies on dicta in a public duty doctrine case, *Bailey v. Forks*, 108 Wn.2d 262, 271, 737 P.2d 1257, 753 P.2d 523 (1987). In *Forks*, an intoxicated driver collided with and injured the plaintiff. The plaintiff then sued the Town of Forks, alleging that a Forks police officer acted unreasonably in failing to

prevent a man he knew to be intoxicated from driving. The trial court granted a judgment on the pleadings in favor of Forks. On appeal, the Supreme Court rejected Forks' argument that the public duty doctrine shielded it from liability. It found that the facts alleged by plaintiff fit within the "failure to enforce a statute" exception to the public duty doctrine and reversed and remanded the matter for trial. The *Forks* court then sought to reassure the municipality that "[a]pplication of the failure to enforce exception does not expose Forks to the specter of unlimited liability", *Forks*, at 270, explaining:

> Forks has only the limited duty of care to act reasonably within the framework of the laws governing the municipality and the economic resources available to it. In determining whether a municipality's act or failure to act was unreasonable, the trier of fact can take into account the municipality's available resources and its resource allocation policy. . . .

*Forks*, 108 Wn.2d at 271.

The State would extend the reasoning of *Bailey v. Forks, supra*, to this situation — where the legislative body has developed priorities for the expenditure of funds. In addition to the fact that the cited language in *Forks* is dicta, the facts and policies involved are distinguishable from those at hand. In *Forks* the court was grappling with the application of the public duty doctrine. After determining that the doctrine did not apply and opening the door to liability, the court partially closed the door again by inserting the language regarding consideration of limited resources.

The *Forks* case is consistent with a modern trend to recognize a duty on the part of government, under certain circumstances, to restrain one private individual in order to protect another person from potential harm. *Compare Emery v. Littlejohn*, 83 Wash. 334, 345, 145 P. 423 (1915) (patient who was not yet "cured" was discharged from state mental hospital, committed a tort and victim sued State; although supervising doctor was found negligent, State was immune from liability because doctor acting in an official capacity in a manner involving exercise of discretion) *with Petersen v.*

*State*, 100 Wn.2d 421, 435, 671 P.2d 230 (1983) (doctor's decision not to seek continued confinement of patient in state mental hospital not exempt from liability on basis of discretionary function exception). However, the courts of this state have carefully stated parameters that limit this duty. *See, e.g., Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992); *Hostetler v. Ward*, 41 Wn. App. 343, 363, 704 P.2d 1193 (1985) (liability for failure to take reasonable precautions to protect anyone who might foreseeably be endangered by conduct of third party predicated upon a "special relationship") (citing *Bailey v. Forks, supra*), *review denied*, 106 Wn.2d 1004 (1986).

The dicta in *Forks* suggests a further effort to qualify a government's duty to protect its inhabitants from third party conduct. There are unique policy reasons for limiting liability in these circumstances. The government's ability to allocate sufficient resources to protect the public against all imaginable potential offenders is severely reduced by its inability to forecast the number of individuals who may present a threat to public safety at any particular time. Furthermore, the *Forks* discussion was in the context of a municipality, dependent on state law to generate revenue. *See Whatcom Cy. v. Taxpayers*, 66 Wn. App. 284, 289, 831 P.2d 1140 (1992). In light of these factors, the trier of fact may need to consider available resources in order fairly to determine if a municipality exercised reasonable care in failing to detain an intoxicated driver.

On the other hand, the State is responsible for the design, inspection, maintenance, opening and closure of its own network of roads. RCW 47.28.010. *See Stewart v. State*, 92 Wn.2d 285, 288, 597 P.2d 101 (1979); *Gibson v. Tacoma*, 60 Wn. App. 26, 31, 803 P.2d 1 (1990) (State has responsibility for streets that are part of state highway system), *review denied*, 116 Wn.2d 1002 (1991). The State is required to act with the same degree of care as a private entity, notwithstanding limited resources. RCW 4.92.090. Most significant is the fact that the State (which includes the legislative

branch) is in control of the allocation of state funds, as well as the operation and maintenance of its roads. If resources are insufficient and a road is unreasonably hazardous, the State has several options. At a minimum, the State can place warning signs. In the most serious situation, the State can close the road. *Forks* is not applicable under these circumstances. The State cannot avoid responsibility for its fiscal decisions by stating that those decisions have assumed the status of law and thus are unassailable.

In any event, the trial court did not preclude the State from presenting evidence with regard to the careful scrutiny it gives potential projects and the priority process it uses to determine the allocation of funds. The issue before the jury was whether the State failed to assess properly the risks and benefits of improvements to the particular stretch of SR 900. The trial court properly allowed evidence demonstrating the benefits and burdens of improving that piece of road. The burden quotient of a risk-benefit analysis includes cost along with other considerations. Accordingly, the State presented evidence of the cost of the project and the process it used in determining project priority. The State introduced evidence showing that it carefully considered the potential hazards, determined the costs of improving the road, and made a reasonable determination that those hazards were not sufficiently serious to warrant action. There certainly was sufficient evidence from which the State could argue that it exercised due care in deciding that this road did not need improvements and, furthermore, that it acted appropriately in giving other projects higher priority with regard to the expenditure of state funds.

Overall, the trial court allowed the State great latitude; it simply did not admit the *1986 Priority Array* or allow the State to compare SR 900's condition with the condition of other roads. The trial court reasoned that the proffered evidence comparing the relative safety of this road to every other highway in the state was not relevant and that it would, in effect, permit the State to mount a poverty defense

using alternative rhetoric. These reasons are not untenable. The trial court did not abuse its discretion in limiting the evidence of the priority process as it did. We find no error.

### III

The State also assigns error to the court's failure to give a series of jury instructions explaining the priority process, as well as an instruction stating that activities carried out in accordance with the priority programming law are immune from liability. Again, we find no error.

Jury instructions are sufficient if they permit each party to argue its theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law. The number and specific language of instructions are left to the discretion of the trial court. *Douglas v. Freeman*, 117 Wn.2d 242, 256, 814 P.2d 1160 (1991). While a trial court must consider proposed instructions, it is under no obligation to give misleading instructions or instructions not supported by authority. *Andrews v. Burke*, 55 Wn. App. 622, 627, 779 P.2d 740, *review denied*, 113 Wn.2d 1024 (1989). Nor should the trial court instruct regarding a party's theory of the case unless there is substantial evidence to support the theory. *Klein v. R.D. Werner Co.*, 98 Wn.2d 316, 318, 654 P.2d 94 (1982).

Here, the court considered all of the proposed instructions and rejected those dealing with the priority process. To do so was not an abuse of discretion.

Based on the instructions that the court did give, the State had adequate opportunity to argue its theory that it acted reasonably in determining that SR 900 did not need maintenance or renovation. The rejected instructions provided specific details of the priority array system and supported the State's theory that it acted reasonably because it acted in accordance with legislative mandate. As discussed above, the trial court properly limited the State's introduction of evidence in support of this theory. Thus, the proposed instructions were not supported by the evidence and were correctly excluded.

The trial court also properly refused to instruct the jury that "it may not find the Department of Transportation liable" if it determined that the State acted in accordance with the priority programming law. RCW 47.05 does not state that compliance with the priority program insulates the State from liability. Although compliance with a statute is generally admissible as evidence of due care to assist the trier of fact, it is not conclusive evidence. *See Estate of Celiz v. PUD 1*, 30 Wn. App. 682, 638 P.2d 588 (1981) (utility's compliance with electrical standards in Washington Administrative Code does not mean a lack of negligence; rather it means compliance with the State's minimal requirements). Thus, even if the State's compliance with the priority array statute was properly in evidence, the State's immunity instruction is an incorrect statement of the law. *See Andrews*, 55 Wn. App. at 627. The trial court did not err in refusing this instruction.

## IV

The State's final argument is that the court erred when it instructed the jury that it could find Handorff-Sherman was not negligent if it found that he was reacting to an emergency. The State contends that Handorff-Sherman's admission of responsibility precludes his invocation of the emergency doctrine. It is a well-established principle that the emergency doctrine does not apply where a person's own negligence put him in the emergency situation. *Sandberg v. Spoelstra*, 46 Wn.2d 776, 285 P.2d 564 (1955). Here, the trial judge concluded that the jury was not bound to accept Handorff-Sherman's testimony and that there was sufficient evidence for the jury to find that Handorff-Sherman crossed the center line in response to an emergency — the loss of traction of his tires on the slippery road. Any error in the giving of this instruction would be harmless because the jury clearly rejected the emergency theory when it found Handorff-Sherman 50 percent negligent. *See Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983) (harmless error not grounds for reversal).

The judgment of the trial court is affirmed.

PETRICH, C.J., and ALEXANDER, J., concur.

Reconsideration denied February 11, 1993.

Review granted at 121 Wn.2d 1021 (1993).