[No. 34950-3-I.    Division One.    September 11, 1995.]

NELS BODIN, ET AL., *Appellants*, v. THE CITY OF STANWOOD, *Respondent*.

*Julian C. Dewell*, for appellants.

*Donna Young* and *Margaret A. Sundberg*, for respondent.

WEBSTER, J. — In 1990, record rainstorms caused severe flooding of the Stillaguamish River basin. The flood waters entered a sewage lagoon owned and operated by the City of Stanwood. Sewage spilled over the lagoon dikes and onto adjacent property. The appellants, adjacent property owners, sued Stanwood for negligence, nuisance, and inverse condemnation. The court dismissed the inverse condemnation claim and the jury returned a verdict in favor of Stanwood on the negligence and nuisance claims. We are to decide whether Stanwood's procurement of federal grants to improve the lagoon and its dikes is admissible to demonstrate the reasonableness of Stanwood's decisions about diking. Because the source of funding tended to prove the reasonableness of the timing and scope of Stanwood's response to the risk from inadequate diking, we find it is relevant evidence. This appeal also presents the issue of whether a continuing fear of flooding gives rise to an inverse condemnation cause of action. We hold that a continuing fear does not meet the physical invasion requirement of inverse condemnation and affirm the dismissal as a matter of law. Finding no merit in the prop-

erty owners's other assignments of error, we affirm the judgment in favor of Stanwood.

### FACTS

Since 1962, Stanwood has operated a sewage treatment facility and oxidation lagoon adjacent to the Stillaguamish River. The Washington State Pollution Control Commission approved the lagoon's original design, and it operates under a Department of Ecology permit. The parties dispute both the heights of the dikes, and what conditions constitute a 100-year flood. Appellants contend the dikes are as short as six feet in some areas and the 100-year flood elevation is eleven to twelve feet. Stanwood asserts the dikes are 9.5-10.5 tall and 100-year flood conditions exist at 9.5 feet. Appellants's properties are on Leque Peninsula, immediately south to southwest of the lagoon, and surrounded by a horseshoe-shaped portion of the Stillaguamish River.

High tides and heavy water flow in the Stillaguamish River have caused periodic flooding in Stanwood. Leque Peninsula property owners knew of floods in surrounding areas, although their personal properties have not been recurrently flooded. The City of Stanwood knew that high floods could enter the lagoon, and threaten the lagoon and Leque Peninsula properties. In the late 1970s or mid-1980s, Stanwood investigated flood control and diking to address general flooding problems and the specific issue of water coming into the sewer lagoon. In 1976, a "Final Facility Plan" for the sewage lagoon recommended increasing the lagoon dikes to twelve feet, one foot above the Army Corps of Engineers's 100-year flood elevation projection. A 1986 flood control project proposal recommended raising dikes to twelve feet. The proposal recognized "a particular urgency" — the near breach of dikes by flood waters each time the Stillaguamish River sends waters into the Irvine Slough.

Although Stanwood had sufficient funds in its sewer construction fund to raise the dikes, it chose to apply for

state and/or federal government grants. Stanwood submitted a Housing and Urban Development (HUD) block grant application, applied for section 404, hydraulics, shorelines, and flood control zone permits, and completed National Environmental Policy Act and State Environmental Policy Act checklists. HUD approved Stanwood's grant application in April 1989. Stanwood then authorized formal engineering design for the project, and determined what real property it needed to purchase.

On November 10, and November 24, 1990, while Stanwood was in the process of purchasing necessary properties, the lagoon flooded, spilling secondarily treated sewage onto real and personal property owned and/or leased by appellants (hereafter collectively "Bodin"). Bodin contends that the November 1990 floods were, at worst, a fifteen- or thirty-year flood. Stanwood argues that the floods exceeded not only the 100-year flood projections, but also the 500-year flood projections. The November 1990 floods were the first floods to go over the top of the lagoon dikes, which Stanwood built in 1963.

Bodin's complaint alleged negligence, nuisance, and inverse condemnation. The trial court granted summary judgment dismissing Bodin's inverse condemnation claim and a negligence claim based on Stanwood's flood fighting efforts. A five-week jury trial culminated in a defense verdict. The verdict was rendered on special interrogatory which asked simply whether Stanwood was negligent ("no"), whether the negligence proximately caused damage to Bodin (unanswered), whether Stanwood caused a nuisance ("no"), and whether the nuisance proximately caused Bodin damage (unanswered). The trial court denied Bodin's posttrial motions and entered judgment in favor of Stanwood.

## Discussion

### Relevance of Stanwood's Efforts To Procure Grants

Bodin contends that Stanwood had known, since the late 1970s, that the sewer lagoon dikes needed to be raised,

but "willfully failed and neglected to remedy this problem until the lagoon overflowed." Thus, Bodin's negligence cause of action rested in part on Stanwood's alleged failure to improve the dikes. Stanwood responded that, in accordance with its engineer's recommendations, it had planned and partially performed flood control improvement (including, but not limited to, raising the lagoon dikes). The 1986 flood control project proposal recommended a three-phase improvement plan. The third phase consisted of "raising and improving the existing East dikes to protect against the flooding of the sewer lagoon area." A 1987 engineering report recommended raising the east end dike between 1987 and 1992. Stanwood also introduced evidence that it applied for county, state, and federal grants to pay for the recommended flood control improvements. Bodin contends that the source of funding for the proposed flood improvements is irrelevant. ER 401. We review the trial court's evidentiary ruling for abuse of discretion. *McCluskey v. Handorff-Sherman*, 68 Wn. App. 96, 105, 841 P.2d 1300 (1992), *aff'd*, 125 Wn.2d 1, 882 P.2d 157 (1994).[1]

Several Washington cases, in dicta, indicate a liberal standard of relevance that would allow introduction of evidence of funding availability or priority. *See, e.g., McCluskey*, 125 Wn.2d at 8 ("a full discussion of funding limitations was relevant to the discussion of whether the State was reasonable in failing to resurface or to construct a median barrier"); *McCluskey*, 68 Wn. App. at 109 (trial court, although it excluded a *Priority Array*, allowed the State great latitude, including evidence from which the

---

[1]Bodin also asserts the trial court erred by not instructing the jury to disregard such evidence, and by failing to grant Bodin judgment notwithstanding the verdict. "Jury instructions are sufficient if they permit each party to argue its theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law." *McCluskey*, 68 Wn. App. at 110. "A JNOV is appropriate when the court finds, after viewing the evidence in the light most favorable to the nonmoving party, 'as a matter of law, . . . there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party.'" *Savage v. State*, 72 Wn. App. 483, 493, 864 P.2d 1009, *review granted*, 124 Wn.2d 1017 (1994) (quoting *Industrial Indem. Co. of the Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 915-916, 792 P.2d 520 (1990)).

State could argue that it acted appropriately in giving other projects higher priority with regard to expenditure of state funds); *Savage v. State*, 72 Wn. App. 483, 495, 864 P.2d 1009 ("[w]hile the availability of funding may be relevant to the reasonableness of the officers' actions, there is no authority for the State's argument that it was entitled to a specific instruction on this issue"), *review granted*, 124 Wn.2d 1017 (1994); and Bailey v. Forks, 108 Wn.2d 262, 737 P.2d 1257 (1987), 753 P.2d 523 (1988) ("[i]n determining whether a municipality's act or failure to act was unreasonable, the trier of fact can take into account the municipality's available resources and its resource allocation policy"). Although these cases discuss the relevance of funding availability and/or priority, they do not decide the issue, nor do they address whether the *source* of funding is relevant to a negligence cause of action.

■ Negligence is conduct which falls below a standard established by the law for the protection of others against unreasonable risk of harm. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 31 (5th ed. 1984).[2] In determining whether a person has exposed another to unreasonable risk of harm, alternative courses open to the person may be considered.[3] *Id.* § 31. Cost or inconvenience may justify taking risks which are not too extreme.[4] Because Bodin alleged inaction, Stanwood's method of addressing perceived lagoon diking needs tended to make more or less probable the reasonableness of Stanwood's acts. ER 401. The method during the 1970s and most of

[2]Nuisance is "a substantial and unreasonable interference with the use and enjoyment of land." 1 William H. Rodgers, *Environmental Law* § 2.2, at 33 (1986).

[3]Instruction 13 provided that negligence "is . . . the failure to do something which a reasonably careful person would have done under the same or similar circumstances."

[4]*Martinez v. Grant County PUD Dist. 2*, 70 Wn. App. 134, 140, 851 P.2d 1248 (economic cost relevant to whether PUD should have raised, buried, insulated or fenced off high voltage transmission lines), *review denied*, 122 Wn.2d 1020 (1993); *Pederson v. Dumouchel*, 72 Wn.2d 73, 79, 431 P.2d 973 (1967) (standard of care for medical practitioners should reflect "readily accessible" medical treatment facilities).

the 1980s was study, planning, and application for funding.[5] The applications for funding, in conjunction with engineering designs, is evidence that Stanwood was taking some action to reduce the risk of harm to adjacent landowners. Furthermore, in tandem with the engineer's recommended implementation schedule, the source of funding supported the reasonableness of the timing and execution of the overall flood control plan. The evidence showed that participation in the federal grant program affected the pace at which Stanwood implemented its flood control plan because of federal permit, review, and land acquisition requirements. While the jury could have found Stanwood's decisions unreasonable, the court did not abuse its discretion in admitting evidence of the source of flood control funding.

Bodin also contends that evidence of the source of funds allowed Stanwood to mount a "poverty defense using alternate rhetoric." *See, e.g., McCluskey*, 68 Wn. App. at 109-10. There is nothing in the record which indicates that Stanwood utilized the source of funding except to argue that it had acted prudently given the recommendations of its engineers and its desire to implement a multiphase flood control system.[6] The evidence showed considerable available funds in Stanwood's sewer construction fund, allowing Bodin to argue that Stanwood exposed the adjacent landowners to unreasonable risk by waiting for grant funds.

In conclusion, admitting evidence of the funding sources sought by Stanwood to implement flood control was within the trial court's discretion. Because the evidence was properly admitted, there was no error in refusing Bodin's proposed instruction. Substantial evidence supported the

---

[5]The time at which Stanwood recognized or should have recognized diking deficiencies was sharply disputed.

[6]Neither opening nor closing argument is part of the record.

jury's verdict, and the trial court did not abuse its discretion in denying Bodin's posttrial motions.

### Inverse Condemnation: Continuing Fear of Flooding

Bodin contends the trial court erred by dismissing his inverse condemnation cause of action on summary judgment. Summary judgment is reviewed de novo. *Ernst Home Ctr., Inc. v. United Food & Communal Workers Int'l Union, Local 1001*, 77 Wn. App. 33, 40, 888 P.2d 1196 (1995).

■ Washington's constitution requires compensation when private property is taken or damaged for public use:

> No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner . . .

Const. art. I, § 16. "The term 'inverse condemnation' is used to describe an action alleging a governmental 'taking,' brought 'to recover the value of property which has been appropriated in fact, but with no formal exercise of the power'." *Lambier v. Kennewick*, 56 Wn. App. 275, 279, 783 P.2d 596 (1989) (quoting *Martin v. Port of Seattle*, 64 Wn.2d 309, 310 n.1, 391 P.2d 540 (1964), *cert. denied*, 379 U.S. 989 (1965)), *review denied*, 114 Wn.2d 1016 (1990). An inverse condemnation plaintiff must prove a "taking" greater than " 'mere tortious interference.' " *Gaines v. Pierce County*, 66 Wn. App. 715, 725, 834 P.2d 631 (1992) (quoting *Northern Pac. Ry. v. Sunnyside Valley Irrigation Dist.*, 85 Wn.2d 920, 924, 540 P.2d 1387 (1975)), *review denied*, 120 Wn.2d 1021 (1993). A taking does not exist unless an invasion causes damage properly characterized as permanent, or recurring, or chronic and unreasonable. *Gaines*, 66 Wn. App. at 725; *Northlake Marine Works, Inc. v. Seattle*, 70 Wn. App. 491, 511, 857 P.2d 283 (1993).

Bodin first argues that a recurring invasion occurred. The only invasions appearing in the record are the two November 1990 floods. The other record references are to near floods, concern about work on diking, and fears of

potential flooding. The evidence is not sufficient to establish an issue of material fact about whether damage from flooding was recurring. *Cf. Lambier v. Kennewick*, 56 Wn. App. at 283 (where City's design of roadway caused at least eleven cars to career off road onto plaintiff's property in six-year time span, recurrence was inevitable).

■■ Bodin similarly contends that the City's behavior was "chronic and unreasonable," citing *Orion Corp. v. State*, 109 Wn.2d 621, 671, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022 (1988). In *Orion*, the plaintiff owned tidelands within a designated estuarine sanctuary. The State's promotional materials depicted the plaintiff's property within the sanctuary. The plaintiff argued that the promotional materials constituted sufficient evidence of a physical invasion to withstand summary judgment on its inverse condemnation claim. The court found plaintiff's claim "untenable":

> At minimum, a plaintiff must demonstrate a chronic and unreasonable pattern of behavior by the government to support a claim for inverse condemnation by physical invasion. The record, however, contains no specific instances of trespass caused by the State, which has taken affirmative steps to prevent trespass. We agree with the trial court that the "undisputed facts demonstrate no physical invasion of plaintiff's tidelands by defendants."

(Citations omitted). *Orion*, 109 Wn.2d at 671. *Orion* does not hold that behavior without physical invasion can constitute a taking. Such a holding would be irreconcilable with the constitutional provision requiring that the property be taken or damaged. Const. art. I, § 16. It is the damage arising from the invasion which must be permanent, recurring, or chronic for a taking to exist, not governmental behavior. "Chronic" means "perpetual, habitual, constant, continuing a long time, recurring." *Webster's New Twentieth Century Dictionary* 322 (2d ed. 1977). The evidence here does not create an issue of material fact about whether damage from flooding was chronic.

Bodin also contends a continuing fear of flooding constitutes a permanent, recurring, or chronic damage upon which an inverse condemnation claim can be based. Appellant relies on *Ferry v. Seattle*, 116 Wash. 648, 203 P. 40 (1922). In *Ferry*, the court held the evidence sufficient to enjoin construction of a water reservoir in Volunteer Park, on grounds of nuisance. *Ferry*, 116 Wash. at 663. Appellant also relies on *Pierce v. Northeast Lake Wash. Sewer & Water Dist.*, 69 Wn. App. 76, 847 P.2d 932 (1993), *aff'd*, 123 Wn.2d 550, 870 P.2d 305 (1994). The Supreme Court decision in *Pierce* (decided after appellant's brief), however, rejects the notion that interference with enjoyment alone, without diminution in substance or value, is sufficient to establish inverse condemnation. *Pierce*, 123 Wn.2d at 563-64. The declarations proffered by appellants make only generalized references to decreased enjoyment; there is no evidence that Stanwood's failure to raise its diking did more than decrease appellant's enjoyment. Thus, the alleged continuing fear of flooding is insufficient to withstand summary judgment in favor of Stanwood.

The judgment is affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BECKER, J., and PEKELIS, J. Pro Tem., concur.

Review granted at 128 Wn.2d 1025 (1996).