2015 AUG 24 AM 9: 05



# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

OLIVER L. WUTH, A MINOR, BY AND THROUGH HIS GUARDIAN AD LITEM KEITH L. KESSLER; AND BROCK M. WUTH and RHEA K. WUTH, husband and wife,

Cross-Appellants,

v.

LABORATORY CORPORATION OF AMERICA, a foreign corporation; DYNACARE LABORATORIES, INC., a foreign corporation; DYNACARE NORTHWEST, INC., a domestic Corporation, Inc., d/b/a DYNACARE LABORATORIES, INC., KING COUNTY PUBLIC HOSPITAL DISTRICT NO. 1, d/b/a VALLEY MEDICAL CENTER; et al.,

Cross-Respondents,

and

JAMES A. HARDING, M.D.; and OBSTETRIX MEDICAL GROUP OF WASHINGTON, INC., P.S., a domestic corporation,

Respondents.

No. 71497-0-I (Consolidated w/ 71498-8-I/71553-4-I)

DIVISION ONE

PUBLISHED OPINION

FILED: August 24, 2015

SPEARMAN, C.J. — After their son, Oliver, was born with severe birth

defects, respondents Brock and Rhea Wuth brought suit against Dr. James

Harding and his employer, Obstetrix (Dr. Harding), Valley Medical Center (Valley) and Laboratory Corporation of America (LabCorp), in their own capacity and on behalf of their son, for claims of wrongful birth and wrongful life. The jury found Valley and LabCorp equally at fault and awarded the Wuths $25 million on each claim. The jury found Dr. Harding not liable. LabCorp appeals, asking this court to review: (1) the trial court's refusal to grant summary judgment for LabCorp on Brock and Rhea's wrongful birth claim; (2) several of the trial court's evidentiary rulings; (3) the trial court's conduct during voir dire; (4) the trial court's comments throughout trial regarding the Wuths' culpability; and (5) the jury verdict on both claims.[1] Finding any error to be harmless, we affirm.

## FACTS

Oliver Wuth was born with severe birth defects. His parents, Brock and Rhea, testified that at birth he looked "vacant" and "broken."[2] Report of Proceedings (RP) 1442, 1479, 2784-85.[3] He was not physically proportional—his feet and toes were tiny; his fingers were long, but his hands were very small. He had inverted nipples and a buried penis. His head was bent and turned. The muscles and tendons in his legs were so tight that his legs would not straighten. When the Wuths brought Oliver home from the hospital, he did not feed normally

---

[1] Valley also appealed the verdict but subsequently reached a settlement with the Wuths and this court granted the parties' joint request to dismiss the appeal.

[2] Where appropriate we refer to the Wuths by their first names for clarity.

[3] The sequentially paginated trial transcript is referred to herein as "RP." Transcripts of pretrial and post-trial proceedings are referred to by date and, as applicable, "a.m.," "p.m.," "voir dire," etc.

and rapidly lost weight. He also missed many of the milestones for early childhood, including developing language skills and toilet training.

At the time of trial, physical therapy and other interventions had alleviated some of Oliver's defects. His head and neck had been reformed and his leg muscles loosened and straightened. But he could not walk up stairs or run. His vision, judgment, and fine motor skills remained in the impaired or severely impaired range. His brain was underdeveloped and small. And, although he was working with a speech therapist and special education teachers to learn to use a computerized "talker," his own speech was limited to a few dozen words understandable only to his immediate family.

Oliver's parents, Brock and Rhea Wuth, met in 1995 when Brock was 15 and Rhea was 17. They married five years later and had their first son, Ian, in May 2002. Although Ian was healthy, Brock's family had a history of birth defects. Brock's maternal aunt, Patsy, had been institutionalized and died before Brock was born. In addition, Brock's cousin Jackie, the daughter of Brock's maternal uncle, had profound disabilities including terrible seizures, anti-social behavior, and obesity that confined her to a wheelchair. Until Jackie was 15, no one in Brock's family knew the cause of Jackie's disability.

In 2003, shortly after the technology to do so was developed, Jackie underwent genetic testing at Seattle Children's Hospital (Children's) to determine the cause of her disabilities. The tests revealed a chromosomal anomaly that explained her condition. Normally, each person has 46 chromosomes in 23 pairs. The testing at Children's revealed that, in one of Jackie's ancestors, genetic

material at the ends of chromosomes 2 and 9 had changed places. This exchange of genetic material between two chromosomes is known as a "translocation." RP at 944. When a person inherits two derivative chromosomes that, between them, have a full set of genetic material, known as a "balanced translocation," the condition is asymptomatic. RP at 945-46. Jackie inherited a derivative chromosome 2 that has some deleted material and an extra copy of part of chromosome 9. But she did not inherit a derivative chromosome 9 with the missing material from chromosome 2; consequently, she is missing genetic material from chromosome 2. Her "unbalanced translocation" is the cause of her birth defects. RP at 1766.

In light of Jackie's test results, a genetic counselor at Children's recommended that members of her extended family undergo genetic testing to determine if they also carried the translocation. This testing revealed that several family members, including Brock, had asymptomatic, balanced translocations. Ian Wuth was too young to be tested but, given his lack of symptoms, it was apparent that he either did not inherit the translocation or has a balanced translocation like Brock.

Because Brock and Rhea planned to have more children, they consulted with a genetic counselor at Children's after receiving Brock's test results. The counselor advised the couple that there was a 50 percent chance that any baby they conceived would have either an unbalanced 2;9 translocation like Jackie or an unbalanced 9;2 translocation, which was also likely to result in "physical differences and some degree of learning disability or mental retardation." Clerk's

Papers (CP) at 1860. The counselor also informed them that pregnancies with chromosome imbalances are frequently miscarried. The counselor explained that any chromosomal translocation could be detected in a fetus through the use of either chorionic villus sampling (CVS) or amniocentesis to extract fetal genetic samples and laboratory testing, specifically a process called fluorescent in situ hybridization (FISH) testing.[4] Children's provided the Wuths with a detailed written report, which explained the 2;9 translocation and identified the specific "breakpoints" in Brock's chromosomes. RP at 984; Ex. 11.

Although Brock and Rhea wanted to have more children, they had no desire to bring a child with Jackie's disabilities into the world. Accordingly, they carefully followed the recommendations they had received from the Children's genetic counselor, including exploring in vitro fertilization. When they managed to conceive again, they brought the Children's report on Brock's genetic condition to each pregnancy-related medical appointment. Despite their care, Brock and Rhea miscarried six times between 2003 and 2008.

In November 2007, Rhea was pregnant again. This pregnancy had progressed well into the first trimester without incident and the Wuths were hopeful that Rhea would not miscarry, as she had before. Their hopes were further bolstered when Rhea had normal ultrasounds before and after an appointment with her obstetrician on December 6, 2007.

---

[4] A FISH test is a specific type of genetic test that can "detect more subtle translocations" in chromosomes. RP at 1323.

5

But the couple remained anxious about the pregnancy. They told Rhea's obstetrician about Brock's translocation and showed her the report from Children's. They also told the doctor about Brock's cousin, Jackie, explaining that they would not bring a fetus with an unbalanced translocation to term. Given the couple's concerns, Rhea's obstetrician scheduled an appointment for her to undergo a CVS procedure at the maternal-fetal medical clinic at Valley to obtain genetic material from the fetus to test for the 2;9 translocation. The doctor also scheduled Rhea for additional genetic counseling at Valley and faxed a copy of the Children's report to Valley.

Even though Rhea's obstetrician had ordered genetic counseling in conjunction with the CVS procedure, Valley's staff scheduled Rhea's appointment for New Year's Eve 2007—a day no genetic counselor was working at the clinic. Rescheduling the appointment presented difficulties, however, because the CVS procedure must be performed prior to the end of thirteenth week of pregnancy and Rhea was twelve weeks and one day into her pregnancy. In addition, staffing and scheduling constraints at both Valley and Swedish Hospital Maternal Fetal Medicine Clinic, which also performed CVS, made it unlikely that Rhea could be rescheduled within the next week. RP 805, 4302-04, 4560. Thus, Rhea's New Year's Eve appointment was likely her last opportunity to receive the CVS procedure.

When Brock and Rhea arrived at Valley for the appointment, Dr. James Harding, a perinatologist/obstetrician, informed the couple that no genetic counselor was available. But, after talking to them at length about the family

history of translocation, Rhea's options for testing, and other risks, Dr. Harding determined that Brock and Rhea were well-informed about the translocation and the risks associated with CVS. The Wuths also wanted to know about any genetic abnormality as soon as possible so, if necessary, they could terminate the pregnancy before it began to show. They knew that after thirteen weeks, amniocentesis was the only test capable of detecting a translocation, but it could not be performed until the beginning of the sixteenth week of pregnancy. The Wuths requested that Dr. Harding proceed with the CVS procedure that day and he decided to do so.

The procedure was performed without incident and Dr. Harding was able to obtain a good fetal genetic sample from Rhea's placenta. Usually, a genetic counselor would have been responsible for completing the lab forms for ordering genetic testing and ensuring that the lab received all relevant paperwork following the CVS procedure. However, since no genetic counselor was on duty, Dr. Harding personally instructed Valley's medical assistant, Cathy Shelton, to prepare the requisition form used to send samples to LabCorp for genetic testing.

At trial Shelton could not recall the specific events surrounding Rhea's appointment. But she stated that generally, when she fills out requisition forms, she does so at the direction of the treating physician. She testified that her usual practice is to check the various boxes on the form indicating known medical history and desired tests, make handwritten notes, and attach documents at the direction of the treating physician. Shelton also acknowledged her handwriting on the requisition form sent to LabCorp with Rhea's fetal tissue sample. A copy of

the requisition form was introduced in evidence at trial. It showed check marks in the boxes indicating "family hx of chromosome abnormality" and "family hx of genetic disorder." Ex. 19-13. It also contained a handwritten notation of "fm hx unbalanced translocation" in the box for "indication" for testing. Ex. 19-14.

Dr. Harding testified that he knew the lab "[a]bsolutely ... had to have [the report on] Brock's translocation" in order to adequately screen the fetal genetic sample for a translocation. RP at 4409. He also testified that, since there was no genetic counselor on the day of Rhea's CVS procedure, he personally photocopied Brock's genetic test report and handed it to the medical assistant, Shelton, to send to the lab with Rhea's fetal tissue sample. Nevertheless, it is undisputed that the document was not attached to the requisition form received by LabCorp. The Wuths and LabCorp each presented evidence at trial that Shelton never sent Brock's genetic test report to LabCorp.

In addition, because Dr. Harding only instructed Shelton to request fetal "karyotype"[5] testing on the tissue sample, Shelton did not fill out the box on the requisition form directing LabCorp to conduct the more sensitive FISH analysis. RP at 4417. Dr. Harding testified that he did not call the lab to confirm that no additional testing was necessary because:

> The genetic counselors usually have done that. And I don't know if they would have in this setting.

---

[5] A karyotype is a visual display of chromosomes taken from a magnified blood or tissue sample. A cytogeneticist in the genetic testing laboratory reviews the karyotype to identify abnormalities.

> But, more, if there was further testing, I know in the past [the lab] would have called to say, either, 'We can't run this test,' the sample, 'We didn't get enough sample,' there's something about it that we can't do that, I would have expected to have heard back from the lab, if there was an issue on that.

RP at 4417. According to Dr. Harding, he "[a]bsolutely" thought that, by asking Ms. Shelton to send the lab Brock's genetic test results, the lab could independently determine whether additional tests were needed. Id.

Once LabCorp received Rhea's tissue sample and the test requisition from Valley, a cytogentic technician in training, Saan Saelee, was assigned to perform the fetal karyotype test ordered. Saelee analyzed the karyotype without ever looking at the "indication" noted on the requisition form accompanying Rhea's sample. RP at 987. Thus, he did not know at the time of testing that he was looking for a translocation, specifically. Saelee did not conduct the more sensitive FISH analysis or independently determine whether additional testing was warranted. No one at LabCorp ever contacted Valley or the Wuths to obtain additional information regarding the translocation noted on the requisition form.

Although not as sensitive as FISH analysis, which the Wuths had wanted, the karyotype test ordered by Dr. Harding and conducted by Saelee was generally sufficient to detect an unbalanced translocation. In fact, Valley's part-time genetic counselor, Elizabeth Starkey, testified that "all of the prior tests that had been done in the family" to detect the translocation were karyotype tests. RP at 4736. However, Starkey also acknowledged at trial that those earlier karyotype tests had been done on blood specimens, which rendered higher resolution images than fetal tissue specimens.

9

Arthur Brothman, LabCorp's expert, acknowledged that Saelee, who was the sole person to review the karyotype of Rhea's sample, had little experience testing fetal tissue samples. Brothman noted it would have been "better for the patient to have two people look at [the karyotype] because there is a better chance they [would] find the problem." RP at 3554. Indeed, Brothman testified the LabCorp's internal policies required such supervision.

Following the fetal karyotype testing, LabCorp reported its results to Valley. The report did not indicate that LabCorp had failed to look for the specific translocation carried by Brock. Instead, the report indicated, without further detail, that Rhea's fetus had a normal "male karyotype." Ex. at 19-05. The report also contained a disclaimer that the "result does not exclude the possibility of subtle rearrangements below the resolution of cytogenetics or congenital anomalies due to other etiologies."

Starkey, testified that she could not recall her specific actions in this case, however it was her normal practice to read test results and relay them to the patient, physicians, and other parties involved in patient care. RP 4683. According to Starkey, she was familiar with unbalanced translocations in 2008 when she would have reviewed Rhea's results. RP 4686. Starkey also testified that the disclaimer on Rhea's report would not have given her cause for concern, as such language "was pretty common or typical ... on virtually every normal karyotyped study." RP at 4783. She further testified that she would not have been alarmed by the fact that the report did not specifically mention testing for translocation:

Q: So...when you got a report like this one and the lab didn't specifically say, 'We have looked for a translocation with chromosomes 2 and 9,' that didn't raise any red flags to you, though, right?"

A: No. Its absences does not raise a red flag.

Q: And that's because, in the reports that you've seen, the lab doesn't routinely specify the specific...[t]ranslocation, correct?

A: Correct.

Q: But you believe that they certainly had looked for the translocation, because the indication for the test was unbalanced translocation, correct?

A: Correct.

RP at 4783-84. And she expressed no concerns that FISH analysis had not been ordered or used.

Starkey telephoned Rhea and told her that the test results were "normal" and that the fetus was not a carrier of the translocation. RP at 1015. Following this conversation, Starkey sent letters to the Wuths and to Rhea's obstetrician, which reiterated that the fetus was a "chromosomally normal male." Ex. at 14-31 to 14-32. Because the results were normal, Starkey did not communicate the test results to Dr. Harding. And she did not send copies of LabCorp's actual report to the Wuths or to Rhea's obstetrician. The Wuths were not informed that Dr. Harding had not requested FISH analysis or that the test had not been performed.

Rhea returned to Valley for a follow up visit with Dr. Harding on January 28, 2008. After reviewing her chart and Starkey's letter to the Wuths indicating the fetus was a "chromosomally normal male." RP at 4475-76. Dr. Harding sent an update to Rhea's primary physician, providing assurances that "the fetal

chromosome results were normal, with no evidence of ... a translocation." CP at 674.

The Wuths were overjoyed when they were assured that Rhea was carrying a "chromosomally normal" fetus. They spent the duration of Rhea's pregnancy excitedly expecting the arrival of a healthy baby boy. But when Oliver was born, it was immediately clear that he had severe physical and cognitive defects. When asked about his first thoughts after Oliver's birth, Brock testified:

A.  He looks broken. He looked like—sorry. You know, we had gone through all this worry that he was going to be—you know, before we had the testing, we thought, well, what if he has the translocation. And then there had been a lot of miscarriages before that. So the whole time up until we got the test results back, we had been holding our excitement at arm's length kind of. We didn't want to become attached, because we weren't sure.
    And then when he was born—well, after we got the test results back, we finally allowed ourselves to get excited about it and feel like, yay, we made it this time, we are going to have a healthy baby.
    And then when he was born, it was clear to me that he wasn't right, and I felt like we had—this thing that we had feared, the genetic translocation, we had gotten away from that only to find that some other thing was wrong with him, and I thought it was very ironic that we had gone through all of this to avoid something and then some other problem was there.
Q.  Testing later determined this was the very problem you had been trying to avoid?
A.  That's right.

RP at 2784-85. Genetic testing at Children's in February 2009 confirmed that Oliver had inherited an unbalanced 2;9 translocation, the same condition that Rhea had undergone CVS and genetic testing to detect and that the Wuths had been assured was not present.

## Procedural History

The Wuths filed this action under ch. 7.70 RCW (Actions for Injuries Resulting from Health Care) against defendants Valley, LabCorp, and Dr. Harding in December 2010. After numerous pretrial motions, trial began in October 2013. The jury returned a verdict for the Wuths and against Valley and LabCorp, but found Dr. Harding not negligent. The trial court entered judgment against LabCorp and Valley. Although both Valley and LabCorp appealed the judgments, only LabCorp remains as a party to this appeal.

The case was originally assigned to King County Superior Court Judge LeRoy McCullough, who resolved a number of pretrial matters including several summary judgment motions. He granted the Wuths' motion to dismiss the defense of comparative fault, based on the lack of any evidence that the Wuths were at fault. The court also limited the damages on Brock and Rhea's wrongful birth claims to mental anguish and emotional distress and the damages on Oliver's wrongful life claim to extraordinary expenses for medical care and specialized training throughout Oliver's life. The court precluded any award to Brock and Rhea for the normal expense of raising a child, for Oliver's future ordinary living expenses and his diminished earning capacity, and also precluded any award to Oliver for general damages.

On June 14, 2013, Dr. Harding filed a motion for partial summary judgment in which he requested that the court dismiss the Wuths' lack of informed consent claim against him and limit the Wuths' negligence claims to

recovery for Dr. Harding's alleged failure to provide LabCorp with Brock's genetic test results. The Wuths did not oppose the motion.

LabCorp filed a written response indicating it was not opposed to the motion except "to the extent Dr. Harding improperly [sought] to limit his co-Defendants from presenting evidence of Dr. Harding's fault that shows his violation of the standard of care or explains LabCorp's actions in this case. . . ." CP at 2723. LabCorp explained that it intended to argue to the jury that fault should be allocated to Dr. Harding based on several alleged breaches of the standard of care for perinatologists in Washington. LabCorp claimed it would elicit testimony regarding the breaches from the Wuths' experts, Dr. Robin Clark and Dr. Marc Incerpi, Dr. Harding's expert, Dr. Thomas Moore, and LabCorp's own expert, Dr. Andrew London.

In his reply, Dr. Harding moved to strike these experts' opinions insofar as they related to the standard of care for perinatologists, arguing that the experts were unqualified to render any such opinion. LabCorp filed a response to the motion to strike, which set forth additional evidence on the qualifications of Dr. Clark and Dr. Moore only. Dr. Harding filed a reply.

Oral argument on the motions focused on the qualifications of LabCorp's expert, Dr. London. Dr. Harding argued that Dr. London was unqualified to opine on the standard of care for a perinatologist practicing in Washington because he was "a gynecologist who practices in Baltimore[, Maryland]". RP (7/18/13) at 37. While noting that the area of an expert witness's specialty was not dispositive on the issue, the court granted Dr. Harding's motion to strike Dr. London because

14

LabCorp had failed to provide any information on Dr. London's expertise in the field of perinatology/obstetrics. RP (7/18/13) at 46. At LabCorp's request, the court clarified that Dr. London was stricken as a witness at trial. The court otherwise denied Dr. Harding's motion to strike expert testimony.[6]

When LabCorp objected to the ruling, the court invited it to file a motion for reconsideration. LabCorp did so, arguing that "counsel for Dr. Harding convinced the Court to exclude Dr. London's trial testimony solely by virtue of her oral representation at the hearing that Dr. London is a gynecologist and lacks the proper qualifications to testify as an expert in this case." CP at 3152. LabCorp argued that Dr. London was, in fact, qualified as an expert in the field of obstetrics and cited his Curriculum Vitae (CV) and his deposition testimony. LabCorp argued that Dr. London had "precisely the type of 'knowledge, skill, [and] experience' ER 702 envisions as qualifying an expert to offer opinion testimony." CP at 3154. Judge McCullough denied the motion on October 14, 2013.

That same day, Judge Catherine Shaffer, to whom the case had been assigned for trial, considered Dr. Harding's motions in limine, which, among other things, renewed his motion to strike Dr. London's testimony. Judge Shaffer was apprised that Judge McCullough had already granted the motion and, consequently, refused to hear further argument on it. The court allowed LabCorp

---

[6] The court also granted Dr. Harding's motion to dismiss the Wuths' informed consent claim and any negligence claim based on Dr. Harding's alleged failure to order FISH testing as a result of an alleged statement by Rhea Wuth that such a test was needed. The court otherwise denied Dr. Harding's motion to dismiss any other negligence based claims against him.

to file an offer of proof regarding Dr. London's qualifications and proposed testimony, which it did on December 2, 2013, three days after the jury verdict.

Following entry of partial summary judgment on the Wuths' claims against Dr. Harding, the Wuths and Dr. Harding reached a partial settlement. The "high/low agreement" established $500,000 as Dr. Harding's minimum liability to the Wuths, regardless of the jury's verdict, and a maximum liability of $2 million, the limits of his liability insurance. LabCorp and Valley were notified of the agreement no later than October 11, 2013. On the Wuths' motion, the trial court excluded reference to the high/low agreement during trial unless the defendants could show collusion between Dr. Harding and the Wuths. The trial court also excluded argument and evidence of Dr. Harding's negligence based on theories other than the one alleged by the Wuths, i.e., that he failed to instruct Valley's medical assistant to send Brock's genetic test report to LabCorp.

Jury selection began on October 21, 2013. On the Wuths' motion, the trial court employed a written juror questionnaire and individual questioning of some prospective jurors to determine whether they were able to render an impartial verdict. The questionnaire asked whether the prospective jurors believed abortion is morally wrong or should be illegal, whether they had close contact with a disabled child, whether they had been a party to medical negligence lawsuit and whether they knew any of the parties. Jurors who responded affirmatively to any of the questions were brought in for individual questioning.

Before trial, Valley moved the court to preclude any "suggestion that the jury send a message or punish Valley Medical Center." RP (10/24/13) at 195.

The Wuths responded that, while they would not be requesting punitive damages, they should be allowed to tell the jury that deterrence, i.e., "try[ing] to encourage this from not happening in the future," is one purpose of the tort system. RP (10/24/13 (a.m.) at 196. The trial court agreed with the Wuths, explaining that "it's okay to articulate the purpose of the laws." RP (10/24/13 (a.m.) at 198. The court ruled that the parties could make a "generalized argument" to the jury about the public policies underlying the tort system, which include both compensation and deterrence. RP at 199. But the court warned, "[I]f there's specific references to these defendants and deterring these defendants, then I'm going to sustain objections." RP at 193. The court also noted LabCorp's standing objection "on the deterrence issue." RP at 5254-55.

Trial proceeded for six weeks, during which Brock and Rhea testified along with other members of the Wuth family and several experts. At several points the trial court instructed the jury that the Wuths did not "bear any fault here ... as a matter of law." RP at 710-11.

During closing arguments, the Wuths asked the jury to award $20,628,306 in special damages for Oliver. On Brock and Rhea's claim they requested "nothing less than an amount equal to the award to Ollie...and up to a range of 50 million [dollars]." RP at 5308. They argued that these amounts were warranted on the evidence, including evidence related to Brock's cousin Jackie's condition and its effect on the Wuths' state of mind.

Additionally, both the Wuths and Dr. Harding made arguments that the jury should award damages to deter similar tortious conduct. LabCorp objected to

17

these arguments and requested a curative instruction. The trial court sustained the objections and instructed the jury that it was improper to award damages to deter the specific defendants in this case or "to send some sort of message." RP at 5389. The court further instructed that the proper purpose of damages was to compensate the plaintiffs.

The jury returned a verdict against LabCorp and Valley and determined that each was 50 percent at fault. The jury determined that Dr. Harding was not liable. Oliver was awarded $25 million in special damages and Brock and Rhea were awarded $25 million in general damages. The trial court entered judgment and denied LabCorp's CR 59 motions to vacate the jury's verdict, amend the judgment or order a new trial.

LabCorp appeals.

## DISCUSSION

### I. Summary Judgment on the Wuths' Claim for Damages

Before trial, LabCorp moved for partial summary judgment on the Wuths' wrongful birth and wrongful life claims, seeking to narrow the scope of damages litigated at trial. LabCorp contends that the trial court's refusal to enter partial summary judgment on the claims was error and, further, the jury verdicts on both the wrongful birth and wrongful life claims must be vacated. LabCorp argues that it was entitled to judgment on Brock and Rhea's wrongful birth claim because, as a matter of law, parents may not recover general damages arising from the birth of a child.

Our Supreme Court has twice considered this issue. In <u>Harbeson v.</u>

18

Parke-Davis, 98 Wn.2d 460, 462, 656 P.2d 483 (1983), the U.S. District Court for the Western District of Washington certified a question to the Washington Supreme Court to determine whether the torts of wrongful birth and wrongful life are actionable in Washington. The Supreme Court concluded that they were. It defined the wrongful birth claim as "an alleged breach of the duty of a health care provider to impart information or perform medical procedures with due care, where the breach is a proximate cause of the birth of a defective child." Id. at 488. The Court further held that parents who establish wrongful birth may recover general damages for "the medical, hospital, and medication expenses attributable to the child's birth and to its defective condition, *and in addition damages for the parents' emotional injury* caused by the birth of the defective child. In considering damages for emotional injury, the jury should be entitled to consider the countervailing emotional benefits attributable to the birth of the child." Id. at 475 (emphasis added).

A year after Harbeson the Court decided McKernan v. Aasheim, 102 Wn.2d 411, 412-13, 687 P.2d 850 (1984), a wrongful pregnancy case about parents' right to recover damages in a tort action for the cost of rearing and educating a healthy and normal, albeit unplanned, child born after an unsuccessful sterilization operation. The parents in McKernan alleged that their doctor had negligently performed a tubal ligation, failed to obtain informed consent to the tubal ligation, breached his warranty that the tubal ligation would result in permanent sterilization, and violated the mother's constitutional right to prevent future pregnancies. They alleged the following damages:

> an amount equal to the cost of the tubal ligation procedure, and expenses; an amount equal to the cost of the pregnancy and child birth; an amount for pain and suffering associated with the tubal ligation, pregnancy and child birth; an amount for loss of pleasure associated with the tubal ligation, pregnancy and child birth; an amount for the husband's loss of services and consortium associated with the tubal ligation, pregnancy and child birth; *an amount equal to the costs associated with rearing a child, college education, out of pocket expenses and services of parents, and emotional burdens.*

Id. at 413. The court affirmed the trial court's partial summary judgment dismissing that portion of the parents' complaint that sought damages for the cost of rearing and educating a normal, healthy child, explaining that it was impossible to establish with reasonable certainty whether the parents were damaged by the birth of such a child and recovery would violate the public policy of the state by inviting disparagement of the child. Id. at 419-21. But, the court expressly noted that the parents could recover damages "for the expense, pain and suffering, and loss of consortium associated with the failed tubal ligation, pregnancy and childbirth." Id. at 421.

LabCorp contends that McKernan overruled Harbeson to the extent it authorized recovery of general damages in wrongful birth claims. The argument is untenable. First, McKernan did not so much as mention Harbeson, and we will not presume that where our Supreme Court has expressed a clear rule of law that it will overturn that decision without explicitly saying so. Lunsford v. Saberhagen Holdings, Inc., 166 Wn.2d 264, 280, 208 P.3d 1092 (2009). Furthermore, McKernan did not, as LabCorp argues, preclude an award for general damages on a wrongful birth claim. Indeed, the McKernan court

20

expressly held that the parents could recover general damages based on pain and suffering related to the negligently performed sterilization procedure, pregnancy and child birth. These amounts are analogous to the general emotional distress and mental anguish damage award at issue in Harbeson and in this case.

LabCorp also argues that there is no way for a jury to determine with certainty the fact of damage to Brock and Rhea as a result of Oliver's birth, citing the Court's reasoning in McKernan that "it is impossible to tell, at an early stage in the child's life, whether its parents have sustained a net loss or net gain." McKernan, at 419-20. But that reasoning is inapposite here. In McKernan, the Court was contemplating the fact that a healthy baby could grow to be a pleasing or troublesome child, either "loving, obedient and attentive, or hostile, unruly and callous." Id. But the uncertain future of a healthy baby born with near limitless potential and prospects is easily distinguished from the relatively finite outlook for a child who, like Oliver, is born with inherent and severe limitations.

We conclude that the trial court did not err when it denied LabCorp's motion for summary judgment dismissal of the Wuths' claims on the ground that general damages are not recoverable on a wrongful birth claim.

Next, LabCorp argues that, because Brock and Rhea's claim for emotional distress lies in negligence rather than an intentional tort, they were required to show objective symptomology in order to recover. LabCorp contends it was entitled to dismissal of the claim because the Wuths offered no such evidence. It cites several cases in support of this position, however none deals specifically

with emotional distress and mental anguish damages in the context of wrongful birth claims under ch. 7.70 RCW. And LabCorp fails to distinguish the Washington cases that plainly reject the argument. See Schmidt v. Coogan, 81 Wn.2d 661, 672, 335 P.3d 424, 431 (2014) (recognizing that claims under ch. 7.70 RCW are among those statutory claims for which emotional distress damages are available in the absence of objective symptomology); Berger v. Sonneland, 144 Wn.2d 91, 113, 26 P.3d 257 (2001) (holding that "the objective symptom requirement is not necessary to prove emotional distress damages under RCW 7.70. . . ."); Price v. State, 114 Wn. App. 65, 72, 57 P.3d 639 (2002) (explaining that Harbeson stood for parents' right to recover emotional distress damages in wrongful birth claims "without requiring physical impact or objective symptomatology"). Accordingly, we find LabCorp's argument without merit.

LabCorp also contends that Brock and Rhea's wrongful birth claim should not have survived summary judgment because they failed to raise a fact issue as to damages. We disagree. As with other claims against health care providers, wrongful birth claims are governed by ordinary negligence principles. Harbeson, at 468. To establish such a claim, a plaintiff must show duty, breach, proximate cause, and damage or injury. Id. A defendant may move for summary judgment by showing that there is an absence of evidence of any of these essential elements. Sligar v. Odell, 156 Wn. App. 720, 725, n.5, 233 P.3d 914 (2010); (citing Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, n.1, 770 P.2d 182 (1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

22

Once this initial showing is made, the inquiry shifts to the plaintiff, who bears the burden of proof at trial. Id. at 725. If "the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [its] case [...]', then the trial court should grant the motion." Sligar at 725 (quoting Young, 112 Wn.2d at 225 n.1 (citing Celotex, 477 U.S. at 322-23)). In such a situation "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial." Id.

Where, "though evidentiary facts are not in dispute, different inferences may be drawn therefrom as to ultimate facts ... a summary judgment would not be warranted." Preston v. Duncan, 55 Wn.2d 678, 681-82, 349 P.2d 605 (1960).

In this case LabCorp moved for summary judgment on Brock and Rhea's wrongful birth claim, arguing that the parents' acknowledgment of the joy Oliver brought to their lives defeated their claim that they were damaged as a result of his birth. LabCorp cited undisputed evidence that:

1. Brock and Rhea were proud, loving, and devoted parents to Oliver.

2. Oliver was a happy child who brings joy to his family's lives.

3. Brock and Rhea would miss Oliver if he was gone from their lives.

4. Brock and Rhea enjoyed watching Oliver grow and develop and play with his brother.

5. Neither parent had received counseling since Oliver's birth and both had returned to work.

CP at 1238. Based on this evidence, LabCorp concluded that "[f]or all of the grief, anguish, and suffering Oliver's birth may have allegedly caused Mr. and Mrs.

23

Wuth, Oliver has brought a net increase in the quality of their lives." CP at 1239.

But whether Brock and Rhea had or would experience a net emotional loss as a result of Oliver's birth was the central factual dispute in their wrongful birth claim. Although the relevant evidence on the issue was undisputed, it established only that Oliver's birth brought both joy and significant anguish to the Wuth family. On this evidence, the jury could have concluded either that Oliver's birth brought a "net increase" or a "net loss" to his parents, depending on the weight it accorded to the various portions of the Wuths' testimony. Because different inferences could be drawn from the evidence, summary judgment was not appropriate. See Preston, 55 Wn.2d at 681-82. The trial court did not err by allowing the claim to proceed to the jury.

LabCorp also contends it was entitled to judgment on Oliver's wrongful life claim. The underlying premise of a wrongful life claim is that, "'[t]he child argues that *but for* the [negligent medical care of its mother], it would not have been born to experience the pain and suffering attributable to the deformity.'" Harbeson, 98 Wn.2d at 478 (quoting Comments, *"Wrongful Life": The Right Not To Be Born,* 54 Tul.L.Rev. 480, 485 (1980)). Noting that a plaintiff is only entitled to that sum of money that will place him in as good a position as he would have been but for the defendant's tortious act (Shoemake ex rel. Guardian v. Ferrer, 168 Wn.2d 193, 198, 225 P.3d 990 (2010), LabCorp reasons that there is no feasible way to calculate damages on Oliver's wrongful life claim because the alternative for him was nonexistence.

LabCorp is correct that Oliver may not recover general damages, which

would require "measuring the value of an impaired life as compared to nonexistence ...[,] a task that is beyond mortals, whether judges or jurors." Harbeson, 98 Wn.2d at 482. But the Harbeson court expressly held that "extraordinary expenses for medical care and special training," which are calculable with certainty, are recoverable by a child claiming wrongful life. Id. Because Oliver's wrongful life claim was properly limited to these special damages, the trial court did not err in denying LabCorp's motion for summary judgment.

## II. Exclusion of Evidence of Settlement Between the Wuths and Dr. Harding

LabCorp challenges the trial court's exclusion of evidence related to the settlement agreement between the Wuths and Dr. Harding. We review a trial court's evidentiary rulings for an abuse of discretion. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). An abuse of discretion occurs when a trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons. Id.

Generally, under ER 408 evidence of settlement or offers to settle is inadmissible to prove liability for a claim. But such evidence may be admitted for other purposes, "such as proving bias or prejudice of a witness." ER 408. Washington courts also recognize that "[t]he existence of an undisclosed agreement between outwardly adversarial parties at trial can prejudice the proceedings by misleading the trier of fact." McCluskey v. Handorff-Sherman, 68 Wn. App. 96, 103-04, 841 P.2d 1300 (1992). And, courts routinely require

disclosure of pretrial settlement agreements where the respective interests of the parties are changed by the pretrial settlement "so that jurors can consider the relationship in evaluating evidence and the credibility of witnesses." Id. at 104 (citing Daniel v. Penrod, 393 F. Supp. 1056 (E.D. La. 1975)). The key inquiry is whether nondisclosure of the evidence would prejudice the proceedings.

In this case, LabCorp argues that "exclusion of the fact of settlement was erroneous and prejudicial because it misled the jury and enabled the settling parties to bolster each other's credibility while maintaining a ruse that they were adversaries." Brief of Appellant (LabCorp at 39-40). We disagree.

Nothing in the record supports LabCorp's claim that the settlement agreement changed the relationship between Dr. Harding and the Wuths such that the failure to disclose it was misleading. On the contrary, if the jury concluded that Dr. Harding was negligent, then, pursuant to the agreement, he would be obligated to the Wuths' for up to $2 million–$1.5 million more than if the jury found no fault on his part. Thus, as the trial court recognized, Dr. Harding "had 1.5 million reasons to defend aggressively in this case, which he did." RP at 59. The mere fact that both the Wuths and Dr. Harding sought at trial to allocate liability to LabCorp and Valley, ostensibly the defendants with "'deep pockets,'" is not, in itself, evidence of a realignment of interests or collusion. See, McKluskey, 68 Wn. App. at 102. Under these circumstances, we cannot conclude that the trial court abused its discretion when it refused to admit evidence of the settlement between the Wuths and Dr. Harding.

III. Admission of Evidence Related to Oliver's Relatives

LabCorp argues the trial court abused its discretion when it admitted evidence related to the condition and prognosis of Oliver's cousin, Jackie. Undisputed expert testimony established that Jackie's condition was not a good indicator of Oliver's prognosis. Accordingly, LabCorp objected to admission of evidence related to Jackie's condition and prognosis on relevancy grounds. LabCorp argues that because the evidence was both irrelevant and highly prejudicial, the trial court erred in admitting it. We disagree.

At trial, it was undisputed that Jackie was the only other person known to have a condition similar to Oliver's. And LabCorp conceded that evidence of her condition was "relevant to the Wuths' understanding [of the condition] and their motivations and the proximate cause issue. . . ." RP at 281. Because the defense offered no indication as to why this relevant evidence was unduly prejudicial, the trial court admitted the evidence, finding it probative of "a really important element here, which is proximate cause." RP at 282. And, to address any lingering issues of undue prejudice, the trial court agreed to give a limiting instruction, making it "clear to the jury this is not about Oliver's condition. This is about the fears and concerns of these plaintiffs, and whether, in fact, they would have terminated, had they gotten results indicating their child bore this abnormality." Id. We find no error in the court's admission of evidence of Jackie's condition for the limited purpose of showing the Wuths' state of mind.

LabCorp also argues that evidence related to Jackie's condition should not have been admitted as a basis for expert opinion. But ER 703 clarifies that the

facts or data relied on by the expert need not be otherwise admissible if of a type reasonably relied upon by experts in the field. And ER 705 expressly authorizes an expert to "testify in terms of opinion or inference *and give reasons therefor without prior disclosure of the underlying facts or data.*" (Emphasis added). The trial court has discretion under ER 705 to allow an expert to relate otherwise inadmissible evidence to the trier of fact to explain the basis for his or her expert opinion, subject to appropriate limiting instructions. State v. Brown, 145 Wn. App. 62, 74, 184 P.3d 1284, 1290 (2008); State v. Martinez, 78 Wn. App. 870, 879-80, 723 P.2d 464 (1995) (recognizing a court's discretion to admit otherwise inadmissible evidence as the basis of an expert's opinion, but not as substantive evidence). Thus, to the extent expert opinion was based on evidence of Jackie's condition, the trial court had discretion to allow expert testimony relating to that evidence.

## IV. Exclusion of Expert Testimony

Dr. Harding moved for summary judgment dismissal of all but one of the Wuths' claims against him, that he breached the standard of care only if he failed to adequately instruct Valley's medical assistant to send Brock's genetic report to LabCorp. The motion was unopposed by the Wuths' or LabCorp. Nonetheless, in its response to the motion, LabCorp raised the issue that expert testimony on other alleged breaches of the standard of care by Dr. Harding should be admitted to establish his fault for the Wuths' claimed injuries in order to offset its own proportionate liability for any jury verdict. LabCorp identified several experts from whom it intended to elicit testimony in support of these positions, including Dr.

Andrew London, and the Wuths' experts, Drs. Robin Clark, Marc Incerpi, Thomas Moore and others. Dr. Harding's motion to strike the testimony of these witnesses was granted as to Dr. London, but otherwise denied. At trial, however, the court found that because Dr. Clark had no experience or expertise in the area of perinatology or obstetrics, her testimony on those subjects was not admissible.[7]

"The trial court is vested with discretion to determine whether a witness is competent to testify as an expert on a particular subject and its ruling will not be disturbed except for a manifest abuse of discretion." Young, at 242. "Expert testimony is usually admitted under ER 702 if helpful to the jury's understanding of a matter outside the competence of an ordinary layperson ... Medical malpractice cases are a prime example of cases where such testimony is needed." Reese v. Stroh, 128 Wn.2d 300, 308, 907 P.2d 282 (1995) (citations omitted). In Washington, "[i]t is the scope of a witness's knowledge and not artificial classification by professional title that governs the threshold question of admissibility of expert medical testimony. . . ." Pon Kwock Eng v. Klein, 127 Wn. App. 171, 172, 110 P.3d 844 (2005) (citation omitted). "So long as a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, '[o]rdinarily [he or she] will be considered qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist.'" White v. Kent Med.

---

[7] The trial court also excluded portions of the testimony of Drs. Incerpi, Moore and others, but on appeal, LabCorp challenges only the exclusion of Dr. London and Clark.

Ctr., Inc., P.S., 61 Wn. App. 163, 173, 810 P.2d 4 (1991) (quoting 5A KARL B. TEGLAND, WASH. PRAC., EVIDENCE § 290[2], at 386 (3d ed. 1989)).

At the hearing on Dr. Harding's motion to strike, LabCorp explained that Dr. London would testify that Dr. Harding breached the standard of care by: (1) failing to make an independent determination that no additional testing was necessary or consult the lab to confirm, that no additional testing was necessary; and (2) failing to actually read the lab report himself. Dr. Harding argued that Dr. London was not qualified to offer such opinions because:

> He is not a perinatologist and no longer practices obstetrics. He has never done CVS testing and LabCorp produces no evidence to establish that he is qualified to establish the standard of care for a perinatologist working with genetic counselors...He based his opinions on a hearsay lunch room conversation with unnamed participants. . . .

CP at 2915. The trial court agreed and granted the motion.

In its motion for reconsideration and on appeal, LabCorp argues that Dr. Harding's motion to exclude LabCorp's proposed expert testimony did not include Dr. London. Therefore, in its response to the motion it made no mention of Dr. London and offered no evidence or argument regarding his qualifications to offer the proffered expert opinion testimony. The argument is not well taken. Dr. Harding clearly asserted in his pleading that Dr. London "has never done CVS testing and LabCorp produces no evidence to establish that he is qualified to establish the standard of care for a perinatologist working with genetic counselors.... His testimony should be stricken or disregarded." CP at 2915. Because LabCorp chose not refute the assertion or provide the court with any

contrary evidence until the matter was heard on oral argument, the trial court did not abuse its discretion when it granted the motion

Nonetheless, in light of LabCorp's representation at oral argument that Dr. London did, in fact, have relevant expertise, the trial court invited LabCorp to submit a motion for reconsideration. LabCorp did so, arguing as it does here, that the requested relief should be granted, first, because Dr. Harding never moved to exclude Dr. London's testimony and, second, because "Dr. London [was] perfectly qualified to offer standard of care opinions regarding an obstetrics specialist like Dr. Harding." CP at 3151. In support of the latter argument, LabCorp cited Dr. London's deposition testimony and CV, noting:

> Dr. London is not "merely" a gynecologist—he is an experienced OB-GYN who has been practicing medicine since 1976. He is also an Assistant Professor of Obstetrics and Gynecology at Johns Hopkins School of Medicine; is a fellow of the American College of Obstetrics and Gynecology; and is a certified diplomat to the American Board of Obstetrics and Gynecology. . . . He has practiced high-risk obstetrics; has co-managed high-risk patients with perinatologists; has worked with genetic counselors; has sent samples to cytogenetics labs for testing; and had one of the larger obstetrics practices in Maryland for a number of years.

CP at 3154.

On this record, we cannot find that the trial court abused its discretion when it refused to reconsider its order striking Dr. London's testimony. LabCorp's first asserted grounds for relief, that Dr. Harding never requested that the trial court strike Dr. London's testimony, is, as noted above, simply not borne out by the record. And, although LabCorp amply supplemented the record on Dr. London's qualifications in its motion for reconsideration, it explains neither why it

failed do so in its written response to Dr. Harding's motion nor why this late-disclosed evidence warranted reversal of the trial court's earlier ruling.

In its motion for reconsideration below, LabCorp cited CR 60 generally, without specifying the particular subsection of the rule that applied, as the basis for relief from the court's order. On appeal, LabCorp cites CR 59(a) as a basis for relief, once again, with no indication of the specific subsection upon which it relies. The only conceivably applicable provisions are CR 59(a)(4)[8] and CR 60(b)(3),[9] which give trial courts discretion to reconsider an order in light of newly discovered evidence unavailable at the time of the earlier ruling, and CR 59(a)(1),[10] which gives similar discretion in the event of procedural or substantive irregularities that deny the moving party a fair trial. LabCorp failed to establish entitlement to relief under these rules, either in its motion for reconsideration or its briefs on appeal.

There is no indication in the record that LabCorp could not have obtained evidence of Dr. London's qualifications with due diligence before the trial court's ruling on Dr. Harding's motion to strike. In fact, much of the evidence LabCorp ultimately cited in support of Dr. London's qualifications

---

[8] The rule gives trial courts discretion to grant a new trial in cases of "[n]ewly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial." CR 59(a)(4)

[9] The rule gives trial courts discretion to grant relief from a final judgment or order in cases of "[n]ewly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 59(b)." CR 60(b)(3).

[10] The rule also gives trial courts discretion to grant a new trial where there has been "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial." CR 59(a)(1).

came from Dr. London's deposition, taken over nine months before the motion to strike. The remainder came from his CV, which was almost certainly available to LabCorp before it ever retained Dr. London as an expert witness in this case. Because LabCorp, exercising diligence, could have offered this evidence before the trial court's ruling, LabCorp was not entitled to reconsideration under either CR 59(a)(4) or CR 60(b)(3).

Likewise, CR 59(a)(1) is of no help to LabCorp. Although it has repeatedly asserted that "procedural irregularities ... resulted in Dr. London being wrongly and prematurely excluded from testifying at trial" and that "LabCorp was not heard on this issue" before the motion for reconsideration, this assertion is not borne out by the record. Reply Brief (LabCorp) at 12-13. LabCorp's argument is based on the dual premise that Dr. Harding never moved to strike Dr. London's testimony and that LabCorp was not notified of the challenge to Dr. London's qualifications or given opportunity to respond before the trial court's ruling. But, as previously discussed, Dr. Harding unambiguously moved to strike Dr. London's testimony after LabCorp raised the issues of standard of care and allocation of fault in opposition to Dr. London's motion for summary judgment. And, although LabCorp addressed the qualifications of other experts in its written response to Dr. Harding's motion to strike, filed two days before the trial court's ruling, it elected to reserve argument on Dr. London. Thus, the lack of evidence of Dr. London's qualifications at the time of ruling was the result of a tactical choice, not an irregularity in the

33

proceedings. Accordingly, we conclude that the court did not abuse its discretion when it denied LabCorp's motion for reconsideration.

In addition to Dr. London's testimony, LabCorp planned to elicit evidence on the standard of care from Dr. Clark, the Wuths' cytogenetics expert. It moved to admit Dr. Clark's deposition, which included "opinions critical of Dr. Harding for proceeding without a genetic counselor present; for not accurately communicating all necessary information to the lab along with Rhea Wuth's sample; for not contacting LabCorp before sending the sample; and for failing to understand the limitations of the karyotype test as stated on LabCorp's report." CP at 10751-52. LabCorp also expressed intent to cross-examine Dr. Clark regarding these pretrial opinions should the Wuths choose to call her at trial.

LabCorp argues the trial court abused its discretion when it denied LabCorp's motion to admit Dr. Clark's deposition and sustained Dr. Harding's objection to testimony that was beyond the scope of Dr. Clark's expertise. We disagree. LabCorp presented no evidence that Dr. Clark, a pediatrician, geneticist, and cytogeneticist, had any experience or expertise in the relevant field of perinatology/obstetrics. There was no abuse of discretion.

LabCorp also claims the trial court abused its discretion when it sustained objection to a line of questioning related to the Wuths' "captain of the ship" theory as beyond the scope of direct. But because this theory was precluded by the court on Dr. Harding's motion for partial summary judgment, this issue was not before the jury. CP at 2250-61. Thus, the ruling was well within the court's broad discretion to determine the scope of cross-examination under ER 611(b). See

34

Miller v. Peterson, 42 Wn. App. 822, 827, 714 P.2d 695 (1986). We also find no abuse of discretion in the trial court's exclusion of opinions from Dr. Clark based on CR 26 because they had not been timely disclosed in her deposition.[11]

## V. Voir Dire

Before voir dire, the Wuths filed a motion with the court, requesting permission to use a jury questionnaire and to conduct limited individual voir dire of prospective jurors. They maintained:

> Any juror who comes to court with a long-held *bias against abortion* would be *predisposed to find against the Wuths on liability or to not award any damages* for Brock and Rhea's parental grief, anguish and emotional distress for giving birth to a genetically defective child. Such jurors would *not be qualified* as juror on this case.

CP at 4455-56. Pursuant to the Wuths' motion, the trial court asked potential jurors in a short questionnaire whether they believed abortion is morally wrong or should be illegal, whether they had close contact with a disabled child, if they had been a party to medical negligence lawsuit and whether they knew any of the parties. Jurors who responded affirmatively to any of the questions were brought in for extended individual questioning. Of the nine potential jurors questioned, eight were dismissed for cause by the trial court.

LabCorp contends that trial court's voir dire procedure and decision to remove 8 potential jurors for cause violated the mandate, under RCW

---

[11] Under CR 26(b)(5), a party is entitled to "[d]iscovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial." Exclusion of the expert's testimony is an appropriate sanction for failure to timely disclose such information. See e.g., Stevens v. Gordon, 118 Wn. App. 43, 49, 74 P.3d 653 (2003); Detwiler v. Gall, Landau & Young Const. Co., 42 Wn. App. 567, 572-73, 712 P.2d 316 (1986).

2.36.080(1), that juries be drawn from a "fair cross section of the population of the area served by the court." However, because LabCorp did not object to the trial court's voir dire procedure below and it conceded that the 8 potential jurors ultimately removed for cause were unqualified to sit on the jury, it is barred from asserting the claimed error on appeal. State v. Perry, 24 Wn.2d 764, 768-69, 167 P.2d 173 (1946).

Moreover, even if LabCorp had timely objected, the use of the questionnaire and the individual juror questioning were within the trial court's considerable discretion to determine how voir dire should be conducted. See State v. Davis, 141 Wn.2d 798, 825-26, 10 P.3d 977 (2000) ("[T]rial courts have discretion in determining how best to conduct voir dire").

And, to the extent LabCorp argues the trial court removed otherwise qualified jurors based solely on their personal beliefs as to abortion, the argument is not borne out by the record. The trial court expressly refused to strike jurors solely because they held strong pro-life beliefs, noting:

> You can get a very fair trial from people who feel strongly that they would never do this, but that they are going to live up to their obligation to treat the plaintiffs fairly. . . . [A] pro[-]choice jury is not something that I think plaintiffs can get or plaintiffs are entitled to.

RP at 211. Consistent with this reasoning, the court refused the Wuths' request to excuse for cause a juror who recognized that "the law being the law is greater than" her "deep seated" pro-life belief that "abortion is murder." RP at 202-03; 207-08. And the record reveals that the 8 potential jurors removed for cause had affirmed that their beliefs prevented them from being impartial or from following

the court's instructions. They were, therefore, unqualified to serve on the jury. Davis, 141 Wn.2d at 825-26; RCW 2.36.110 ("It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.")

## VI. Comments by the Trial Court

"The judiciary has long recognized that 'the ordinary juror is always anxious to obtain the opinion of the court on matters that are submitted to [the juror's] discretion, and that such opinion, if known to the juror, has a great influence upon the final determination.'" Id. (quoting State v. Crotts, 22 Wash. 245, 251, 60 P. 403 (1900)). "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." Art. IV, § 16 of the Washington State Constitution; see also State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997) (noting that Section 16 "prohibits a judge from conveying to the jury his or her personal attitudes toward the merits of the case") (citing State v. Foster, 91 Wn.2d 357, 361, 597 P.2d 892 (1979)). An instruction to the jury improperly comments on the evidence if the instruction resolves a disputed issue of fact that should have been left to the jury. Becker, 132 Wn.2d at 65. We review a challenged jury instruction de novo, within the context of the jury instructions as a whole. Gregoire v. City of Oak Harbor, 170 Wn.2d 628, 635, 244 P.3d 924 (2010).

LabCorp cites seven instances in which the trial judge either verbally instructed the jury or noted in the jurors' presence that the Wuths were not at fault in this case. First, during Rhea's testimony that she assumed FISH testing was a "regular test" ordered "to look for a translocation," the trial court interjected: "As a matter of law, ladies and gentlemen, the Wuths do not bear any fault in this matter." RP at 607. When Rhea was later asked whether she would have talked about FISH testing with a genetic counselor had Valley provided one, the trial court clarified:

> Let me explain what this is for, ladies and gentlemen. Again, the plaintiffs' information about FISH testing is not admissible to show that they bore any fault here, because they did not.
> It's only admissible on the issue of whether or not the lack of information they received in this case did or did not cause them not to timely terminate the pregnancy. That's it.

RP at 609.

Next, when Valley's hospital administration expert, Dr. Neil Kochenour, testified, he speculated that, "if a genetic counselor had been involved when Ms. Wuth came to Valley, that the subject of FISH testing would come up" because Rhea understood the test was used to detect translocations. RP at 709-11. The Wuths' expert Danielle Lagrave, a genetic counselor, offered similar testimony. The trial court interrupted both Kochenour and Lagrave with verbal instructions to the jury, limiting the testimony to its proper use. During Dr. Kochenour's testimony, the court stated:

> Okay. I'm going to see if I can unpack this for the jury.
> You may hear testimony to this effect, that Ms. Wuth said something about FISH testing in the appointment that she had at Valley, but a couple of things I want to remind you of.

38

One is that's not pertinent on the issue of whether or not Ms. Wuth or her husband bear any fault here, because they don't, as a matter of law.

Two, it's not pertinent on whether Dr. Harding bears any responsibility here, because you will not hear sufficient evidence in the record to establish that he heard this mentioned.

It is relevant only on the issue in this case of whether or not Ms. Wuth would have gone forward with the termination, had she received the information about the genetic abnormality that she did not allegedly receive.

RP at 710-11. The court gave a similar instruction during Lagrave's testimony, noting that evidence of Rhea's knowledge of FISH testing was "not admissible to establish any liability by the Wuths, because they don't have any legally here. None. They bear no fault. Its' also not admissible to show any culpability by Dr. Harding, because there is not enough evidence, as a matter of law, to establish he heard this comment." RP at 996.

The court also acknowledged the Wuths' lack of fault during examination of Dr. Harding, following a line of questioning about whether he had advised the Wuths that they might get more reliable test results if they waited to do amniocentesis instead of CVS. The court stated: "I'll remind the jury one last time, the Wuths are not legally at fault at all in this case." RP at 826. The court also noted the Wuths "bear no fault hear" [sic] in sustaining the Wuths' relevance objection to defense counsel's question: "During the hour amount of time you spent with Mr. and Mrs. Wuth, did they ever tell you that they desired genetic counseling on December 31st either prior to or during the time you were doing the CVS procedure?" RP at 4578-79. Lastly, the court reminded the jury that the

Wuths bear no fault during the testimony of the Wuths' expert, Dr. Marc Incerpi, who testified regarding the standard of care for perinatologists.

Although the Wuths' lack of fault was established during summary judgment and was therefore undisputed at trial, LabCorp contends that the court's comments bore on the Wuths' credibility, a factual matter within the jury's discretion. See Edwards v. Le Duc, 157 Wn. App. 455, 459, 238 P.3d 1187 (2010). But the trial judge did not opine as to any matter to be determined by the jury. Contrary to LabCorp's assertions, the court expressed no opinion whatever on the Wuths' character or credibility or the strength of their case. Instead, the trial court merely articulated the basis for evidentiary rulings and appropriately instructed the jury on the use of evidence that was admissible for limited purposes. LabCorp's argument that the effect of these reminders was "that the jurors had 'burned into their brains' an enhanced portrayal of the Wuths as people who could do no wrong and were deserving of a sizeable damages award" is without merit. Brief of Appellant (LabCorp) at 38.

## VII. Limitation of Defense Theories

As previously discussed, the Wuths limited their claims against Dr. Harding before trial as the result of summary judgment proceedings. They advanced only one theory of negligence against him: that Dr. Harding was negligent if he failed to instruct Valley's medical assistant to send Brock's genetic test report to LabCorp. The Wuths argued at trial that LabCorp could only allocate fault to Dr. Harding if the jury found him guilty on this theory. The trial

court agreed and precluded argument that Dr. Harding was at fault based on other theories.[12] LabCorp challenges the ruling.

Generally "any party to a proceeding can assert that another person is at fault." Mailloux v. State Farm Mut. Auto. Ins. Co., 76 Wn. App. 507, 511, 887 P.2d 449 (1995) (citing Adcox v. Children's Orthopedic Hosp. & Med Ctr., 123 Wn.2d 15, 25, 864 P.2d 921 (1993); RCW 4.22.070(1). Notwithstanding, the Wuths argue, as a preliminary matter, that LabCorp waived the right to allocate fault to Dr. Harding by failing to plead the theory as a cross claim or affirmative defense under CR 8(c).[13] We disagree.

CR 8(c) provides:

**Affirmative Defenses.** In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fault of a nonparty, fraud, illegality, injury by fellow servant, laches, license,

---

[12] The court's instruction to the jury on Dr. Harding's liability is consistent with this ruling. It stated:

Dr. Harding was negligent if he failed to instruct Valley's medical assistant, Cathy Shelton, to send clinical information that identified the chromosomes and breakpoints with the test requisition forms and CVS sample to LabCorp.

CP at 11607-08. The record on appeal does not contain a proposed instruction by LabCorp setting forth additional theories of negligence.

[13] The Wuths also made this claim at trial. In a colloquy with the court they argued:

But this is the plaintiffs' claim they are seeking to have allocated. They didn't make any independent claim alleging an empty chair or some sort of empty claim.
I mean, all this is allocating the fault proved by the plaintiff. If we don't prove our claim against Dr. Harding, there is nothing to allocate even if they want to make some other argument. And under the rules, they have got to have this in their pleadings, and they don't.

RP at 5201-02.

payment, release, res judicata, statute of frauds, statute of limitation, waiver, **and any other matter constituting an avoidance or affirmative defense**. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

(Emphasis added). Except for those claims and defenses requiring special pleading under CR 9 and 12, which are not at issue here, Washington generally requires pleadings to be sufficiently specific to put the adverse party on notice of both the fact of the claim and the nature of the claim. See Putman v. Wenatchee Valley Med. Ctr., P.S., 166 Wn.2d 974, 983, 216 P.3d 374 (2009) (citing CR 8(a)); 14 WASH. PRAC., CIVIL PROCEDURE § 12:3 (2D ED.). A defense is treated as having been raised in the pleadings if that defense is consistently raised throughout the litigation. Reichelt v. Johns-Manville Corp., 107 Wn.2d 761, 766-68, 733 P.2d 530 (1987).

In this case, LabCorp's answer, which included as an affirmative defense that "[t]he incident in question resulted from the acts or omissions of persons or entities other than LabCorp for which LabCorp is in no way responsible or liable," put the parties on notice that, at the very least, LabCorp intended to allocate fault to another party or nonparty. CP at 2236. LabCorp's repeated and consistent assertion of Dr. Harding's fault through expert opinions, evidence, and argument submitted to the trial court put the other parties on notice of the precise nature of the claimed defense. Accordingly, the LabCorp satisfied Washington's notice pleading requirements.

Waiver issue aside, we consider whether the trial court erred when it determined, as a matter of law, LabCorp was precluded from allocating fault to Dr. Harding based on theories other than that advanced by the Wuths because no evidence supported any other theory of negligence. We review the trial court's legal determination de novo. Cost Mgmt. Servs., Inc. v. City of Lakewood, 178 Wn.2d 635, 641, 310 P.3d 804 (2013).

At trial the court explained:

> You all need to be supported by standard-of-care evidence to make an argument about Dr. Harding's fault here. And I think this motion rises and falls on that point. Because the only standard-of-care evidence I have heard with regard to Dr. Harding has to do with whether or not he directed Ms. Shelton to complete this paperwork appropriately so that the lab would get the information needed to perform an appropriate test.
> That's it. That's plaintiffs' claim, and that's all there is in this case. He either did it or he didn't.

RP at 5207. LabCorp claims that the testimony of its expert Dr. London and the Wuths' experts, Dr. Clark and Dr. Marc Incerpi, warranted argument and instruction on additional theories of Dr. Harding's negligence. We disagree.

As discussed previously, Dr. London's testimony was properly stricken on Dr. Harding's motion and Dr. Clark's testimony was appropriately limited to opinions within her expertise; she was, therefore, not permitted to testify on the standard of care for perinatologists/obstetricians. Dr. Incerpi testified only that the standard of care for perinatologists/obstetricians required Dr. Harding to make sure Rhea's relevant history and Brock's genetic test report were sent to the lab. Because there was no dispute regarding whether the lab received Rhea's relevant history, Dr. Incerpi's testimony supported only the theory that Dr.

43

Harding was liable if he failed to see that Brock's genetic report was sent to the lab with Rhea's sample. The Wuths, along with LabCorp, argued this theory throughout trial and it was set forth in the court's jury instructions.

Because no competent expert testimony supported LabCorp's argument that Dr. Harding was negligent based on breaches of the standard of care other than the one asserted by the Wuths, the trial court did not abuse its discretion when it prohibited the argument and declined to instruct the jury on LabCorp's theories.

## VIII. Jury Verdicts

In its post-trial CR 59 motion, LabCorp requested, among other remedies, that the trial court reduce the jury's $50 million verdict, which it argued was clearly excessive, unsupported by the evidence, and based on improper argument for punitive damages. It challenges the trial court's denial of the remittitur. We review for abuse of discretion using the substantial evidence, shocks the conscience, and passion and prejudice standard. Bunch v. King Cnty. Dep't of Youth Servs., 155 Wn.2d 165, 176, 116 P.3d 381 (2005).

First, LabCorp asserts that both the award to Brock and Rhea and the award to Oliver are outside the range of evidence. We disagree. The jury heard emotionally-laden testimony from Brock, Rhea, and their family members regarding the emotional distress and mental anguish they have sustained and will continue to endure for the remainder of Oliver's life. In response to the question, "Do you feel you have suffered more emotional harm from Oliver's existence than the emotional benefit you have received from him?" Brock

44

responded, "I think so." RP at 2839. Rhea offered similar testimony, answering the question in the affirmative, "[D]o you feel as though the emotional anguish you have suffered by having Oliver in your life is greater than the emotional benefits you have received from having Oliver in your life?" RP at 1833. The jury was entitled to believe Brock and Rhea's testimony and, under Harbeson, make an award of general damages. The trial court emphatically denied LabCorp's motion for remittitur, noting that the Wuths' "pain has been implicit in all of the evidence that we heard from the plaintiffs, and I guess you had to be here to see it, like me and the jury," strengthens the verdict. RP at 68-71.

LabCorp also contends that the verdict was based, at least in part, on the Wuths' argument during closing that Brock and Rhea's mental anguish was increased by their knowledge of Jackie's condition. LabCorp maintains that the argument was improper and misled the jury. We agree with LabCorp that the argument was improper because, as discussed previously, evidence of Jackie's condition was deemed inadmissible for all purposes except showing proximate cause and the basis for expert opinion.[14] However, LabCorp failed to timely object at trial and, thus, waived any argument on this issue.

LabCorp argues that Oliver's award is also based on the Wuths' improper argument that Jackie's condition bore on Oliver's prognosis. We disagree. Although the argument about Jackie was improper, there was sufficient

---

[14] The Wuths' experts, Dr. Robin Thomas, Dr. Deborah Hill, and Dr. Stephen Glass, as well as Dr. Harding's expert, Perry Lubens, each testified that, because Jackie is the only living person known to have a 2;9 translocation like Oliver, information on her condition is relevant for any expert to consider in reflecting on Oliver's prognosis, though her condition is not necessarily predictive of Oliver's outlook.

independent evidence to support the verdict for Oliver. The jury heard expert testimony that Oliver's extraordinary expenses for medical care and specialized training could amount to $23,675,000 over his remaining 70-year life expectancy. The jury also heard testimony that the estimates of Oliver's extraordinary expenses could not possibly "include all of the components of ... the extraordinary care [Oliver] requires because of his disability," that "future medical expenses [are] reasonably certain to be incurred," and that on a more probable than not basis Oliver will likely benefit from future medical advances that will require additional funds. RP at 63. This evidence, which was unrelated to Jackie's condition, is sufficient to sustain the verdict here. See Erdman v. Lower Yakima Valley, Washington Lodge No. 2112 of B.P.O.E., 41 Wn. App. 197, 208-09, 704 P.2d 150 (1985) (reversing trial court's order setting aside damages verdict; jury was at "liberty" to award future medical expenses "when it was also shown that [plaintiff] would suffer in the future"). Accordingly, the trial court's error in allowing the Wuths to argue that Jackie's condition was indicative of Oliver's future medical needs was harmless.

Next, LabCorp argues that Brock and Rhea's award shocks the conscience. We disagree. The noneconomic damages award in this case is analogous to the award affirmed in Bunch, 155 Wn.2d at 181-81, where the jury awarded noneconomic damages that were roughly 75 percent of the amount of the awarded economic damages. And the roughly one to one ratio of economic damages to noneconomic damages here is nowhere near the ten to one ratio we found shocking in Hill v. GTE Directories Sales Corp., 71 Wn. App. 132, 856 P.2d

746 (1993). Moreover, given the intense and persistent distress felt by the parents in this case, the jury's award is not "so excessive as to be 'flagrantly outrageous and extravagant,' particularly in light of the strong presumption we accord to jury verdicts." Bunch, 155 Wn.2d at 182.

Finally, LabCorp argues that references to deterrence by the Wuths and Dr. Harding throughout closing arguments constituted improper requests for punitive damages. We agree that the argument was improper, but find any error in allowing the argument to be harmless.

It is well established that punitive damages are contrary to Washington public policy. Dailey v. North Coast Life Ins. Co., 129 Wn.2d 572, 575, 919 P.2d 589 (1996). Washington law only permits "compensatory damages [to] fully compensate the plaintiff for all injuries to person or property, tangible or intangible." Barr v. Interbay Citizens Bank, 96 Wn.2d 692, 700, 635 P.2d 441 (1981) (citing Spokane Truck & Dray Co., v. Hoefer, 2 Wash. 45, 52-53, 25 P. 1072 (1891)).

In this case, the parties disputed whether and to what extent deterrence could be discussed as a basis for damages. Following argument in pretrial motions, the trial court ruled that it was "okay to articulate the purpose of the laws," including deterrence. RP at 199. But the court noted that "send-a-message arguments as to particular defendants... move into the area that Washington policy specifically precludes, which is punitive damages." Id. The court ruled that objections would be sustained as to any argument calling specifically for deterrence of the defendants in this case.

Later, before closing arguments began, LabCorp noted a standing

objection on the deterrence issue, arguing that any mention of deterrence was

"only there to inflame the passion and prejudice of the jury ... irrelevant ... [and]

contrary to punitive damages law in Washington." RP at 5254. The trial court

reiterated its earlier ruling on the issue, again ruling that the parties "could talk

about the policy behind the law," but could not "tell the jury basically to enter a

verdict to deter these defendants and to send a message." RP at 5254-55.

Following the ruling, the Wuths began their closing argument as follows:

> As you listen to closing statements, I want you to keep in mind
> there are two reasons under the public policy of the state of
> Washington that we are allowed to hold defendants accountable for
> the harm they cause to individual citizens. One you have already
> heard of. You know it. Compensation. Compensation is balancing
> the harm caused by the negligence to the family with monetary
> compensation.
> The other public policy is deterrence. Deterrence is not
> punishment. Punishment is looking back at behavior and trying to
> punish it with an award. That's not what we are asking for.
> Deterrence looks forward. The purpose of deterrence is to deter
> future misconduct, and that is an express public policy of the state
> of Washington in Washington tort law.

RP at 5257. Subsequently, the Wuths urged jurors to award general damages to

compensate them and to deter the defendants in this case, noting that

"deterrence is important as a reminder that we can never elevate the business of

medicine over the practice of medicine, that it's okay to make a profit ... but ...

the patient has to come first." RP at 5417.

Dr. Harding attempted to paraphrase the Wuths' argument, asserting that

the Wuths' lawyer "talked about the purpose of damages, for compensation and

deterrence." VRP at 5381. He then argued that because the evidence did not

establish negligent conduct on his part, there was no basis for either compensation or deterrence as to him.

Following Dr. Harding's argument, the trial court excused the jury for a break. While the jury was out, LabCorp noted an objection to Dr. Harding's "argument that deterrence is part of damages" and requested a curative instruction. RP at 5383. The trial court agreed to give a curative instruction, but LabCorp argued it was insufficient because the issue of deterrence has "now been linked to damages, which is absolutely inappropriate, and [the jury has] heard it." RP at 5384. LabCorp also reiterated its earlier objection to any mention of deterrence.

The court disagreed that any discussion of deterrence was improper and adhered to its ruling permitting the parties to explain that "[t]he purpose of having a civil tort system is partially deterrence." RP at 5387. It reasoned:

> people can always explain why the law operates the way it does, because the argument that can always be made in any personal injury case is that awarding damages to these specific plaintiffs is like a lottery, just give damages to people who happen to show up and ask for relief, as opposed to everybody who may suffer damages from a practice.
>
> That's why I always think it's fair for counsel to talk about the policy of a law and the reasons why we do things like allow damages in the civil system, but why we have a tort system.
>
> I think where we cross the line, and I think it's fair to criticize an argument that makes this—that's made this way, is when people start saying, you know, award high damages to deter them from ever doing it again.

RP at 5384. But it, again admonished counsel that any argument that damages should be awarded to deter the specific defendants in this case was disallowed.

When the jury reconvened, the trial court gave the following curative instruction:

[I]t's appropriate for the parties to talk to you about what those policies may be that support our civil tort system.

What's not appropriate is for you to award damages in this case to deter these specific defendants or to send some sort of message.

The purpose of damages, as we've outlined in the instructions to you, is to compensate. So the purpose of damages in this case would be to compensate, if you follow me.

There's a difference between what the purposes—what the reasons that support our civil legal system are and what you are to do if you find the damages are appropriate here, which is to assess what is appropriate for compensation.

RP at 5389.

We agree with LabCorp that the trial court erred when it permitted counsel to discuss the issue of deterrence in closing argument. The court attempted to draw a line that distinguished between arguments relating to deterrence as one of the policy bases for the tort system and arguments that damages should be awarded to deter the specific defendants in this case. The distinction is a fine one and, as shown by the Wuths' and Dr. Harding's closing arguments, a difficult one to successfully navigate. The Wuths' argument, for example, that "deterrence is important as a reminder that we can never elevate the business of medicine over the practice of medicine" is strikingly similar to an argument that we deemed improper in Broyles v. Thurston Cnty., 147 Wn. App. 409, 195 P.3d 985, 1003 (2008). There, we held that the argument that damages should be awarded to "make sure this never happens again[ ]" was an improper request for punitive

damages. Id. at 445. Furthermore, as the court's curative instruction pointed out, the issue of deterrence was irrelevant to the jury's assessment of damages or to any other issue before them. Thus, permitting counsel to argue the point presented the needless risk of confusing the jury. Accordingly, we conclude it was error for the trial court to do so.

"At the same time, not every misguided closing argument warrants a new trial." See Carnation Co., Inc. v. Hill, 115 Wn.2d 184, 186–87, 796 P.2d 416 (1990) (misconduct must have a substantial likelihood of affecting the jury's verdict). Id. Here, there is no substantial likelihood that the argument regarding deterrence affected the jury's verdict in this case. The court's written instructions to the jury set forth the proper measure of damages, as set forth in Harbeson. And the court's curative instruction during closing arguments flatly refuted any inference the jury could have drawn from the Wuths' and Dr. Harding's arguments that deterrence is a permissible basis for damages. Washington courts presume that juries follow all instructions given. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). And LabCorp points to no evidence that the jury had trouble understanding or did not follow the court's instructions. Moreover, the verdicts are well within the range of evidence, indicating that the awards are strictly compensatory, rather than punitive. Thus any error in allowing argument regarding deterrence was harmless.

51

Affirm.

WE CONCUR:

Spearman, C.J.

Trickey, J

Verellen, J